# IOWA LIFE INSURANCE COMPANY *v.* LEWIS.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHEN DISTRICT OF TEXAS.

No. 53.    Argued October 21, 22, 1902.—Decided December 8, 1902.

1. As the delivery of a policy of insurance and the payment of the premium are reciprocal or concurrent considerations and together with the method of payment are all essential things, it makes no difference, when the first premium is paid by a note, whether the words "if note be given for the payment of the premium hereon or any part thereof, and same is not paid at maturity, the said policy shall cease and determine" be printed upon the face or the back of the receipt given for the note or in the policy. As such receipt expressed the conditions upon which the note was received, the memorandum on the back must be considered as embodied in the policy and the endorsements thereon, as well as in the note and the receipt given therefor.
2. When the first premium on a policy of insurance is paid by note and a receipt with such an endorsement thereon is given and accepted therefor, whilst the primary condition of forfeiture for non-payment of the annual premium is waived by the acceptance of the note, a secondary condition thereupon comes into operation, by which the policy will be void if the

note be not paid at maturity and no affirmative action canceling the policy is necessary on the part of the insurance company if the note be not paid when due and presented; and if the policy contains a provision that no person other than the president or secretary can waive any of the conditions, a local agent has no power to extend the time of payment of the note after the same has become part due.

3. A life insurance company may by its conduct waive proof of death and estop itself from setting up the provisions of the policy requiring said proof.

4. This court will adopt the construction of the state courts of a state statute as to the necessity of a demand being made before commencement of an action.

THIS is an action upon a life insurance policy, and was originally brought in the District Court of Tarrant County, Texas, and removed by the defendant, plaintiff in error here, to the Circuit Court of the United States for the Northern District of Texas on the ground of diversity of citizenship.

The action was to recover $3000, alleged to have become due upon a life insurance policy issued by plaintiff in error to Thomas M. Lewis, the husband of the defendant in error. The defendant in error also, under the laws of Texas, art. 3071, Revised Statutes of Texas of 1895, prayed judgment for interest on the said $3000 from the date of the death of the said Thomas M. Lewis, together with a penalty of twelve per cent on the amount due, and for an attorney's fee of $750.

The case was tried by a jury and resulted in a verdict for the defendant in error for $3000, the principal of the policy, with interest from January 1, 1900, $300 damages, and an attorney's fee of $500. Judgment was entered in accordance with the verdict.

The statute of the State of Texas, allowing interest and attorney fees, was attacked by plaintiff in error as being in contravention of the Constitution of the United States. The statute was sustained, and the case was brought here under section 5 of the Judiciary Act of 1891.

By the policy the plaintiff in error promised to pay defendant in error the sum of $3000 upon the death of Thomas M. Lewis, if death should occur on or before the fourth day of March, 1900, and to pay the sum within sixty days after the

receipt by plaintiff in error of satisfactory proofs of death and its cause.    Lewis died on the seventh of October, 1899.

The issues in the case besides the constitutionality of the Texas statute are (1) whether the insurance company waived proof of death; (2) whether the policy had ceased and determined before the death of the insured by non-payment of the premium.    The evidence bearing upon the issues is as follows:

"The first sentence of the policy sued upon, appearing upon the face thereof, reads as follows: 'The Iowa Life Insurance Company, in consideration of the stipulations and agreements in the application herefor (a copy of which is hereto attached), and of the provisions and requirements upon the next page of this policy, all of which are a part of this contract; and in consideration, also, of the payment of seventy-four dollars and sixty-one cents, being the premium hereon for the first year, hereby promises to pay the sum of three thousand dollars to Lula T. Lewis (wife of the insured) if living; if not living, to the insured's executors, administrators or assigns (less any indebtedness of the insured or beneficiary to this company, together with the balance of any year's premium remaining unpaid), within sixty days after receipt and acceptance, at the company's office in Chicago, Illinois, of satisfactory proofs of the fact and cause of death, within the terms of this policy, of the said Thomas M. Lewis, of Fort Worth, county of Tarrant, State of Texas (the insured under this policy), provided such death shall occur on or before 12 o'clock noon of the fourth day of March, A. D. 1900.'

"Upon the second page of the policy is a provision reading as follows, it being one of the provisions referred to in the sentence above quoted from the face of the policy: 'This policy is a contract made and to be performed in accordance with the laws of the State of Iowa, and shall be construed only in accordance with the charter of said company and the laws of said State, and shall not go into effect until the premium hereunder, or a semi-annual or quarterly installment thereof, shall have been actually paid during the lifetime and continuance in good health of the insured.    Upon payment of the premium there shall be delivered a receipt signed by the

president or secretary, and countersigned by an authorized agent.'

"Another provision appearing upon the second page of the policy reads as follows: 'All agreements made by this company are signed by the president or secretary. This power will not be delegated. No other person can alter or waive any of the conditions of this policy, or issue permits of any kind, or make an agreement binding upon said company.'

"The policy sued upon is of the kind designated by the defendant as a 'ten-year convertible term stock' policy. It is dated March 13, 1899. The annual premium thereon is $74.61.

"The policy sued upon was issued in pursuance of a written and printed application therefor made by the insured under date of March 4, 1899. Said application requests the issuance of a 'ten-year convertible term stock' policy, and states that the premium of $74.61 is to be paid annually. It concludes with a recital as follows: 'A note for premium of $74.61 has been paid under this application, to make the insurance binding from the date hereof, on condition that if the risk is not assumed by the company, this sum is to be returned, in accordance with the receipt given as voucher for said payment.'

"On March 4, 1899, the insured executed and delivered to S. E. Starn, as agent of the defendant, in partial settlement of his premium, his note, reading as follows:

"'$37.30.                                  March 4th, 1899.

"'Six month after date I promise to pay to the order of myself thirty-seven 30–100 dollars, at Ft. Worth, Texas, value received, with interest at 6 per cent per annum.

"'T. M. LEWIS, M. D.'

"Which he endorsed in blank as follows: 'T. M. Lewis, M. D.'

"On March 5, 1899, S. E. Starn transmitted to the defendant the insured's said application and note with a letter, which in so far as it is material to this bill of exceptions, reads as follows: 'I herewith hand you application of Thomas M. Lewis for $3000.00, 10-year term con. stock. Also his note to cover settlement.' These papers were received by the defendant March 8, 1899, at its office in Chicago.

, " The application was accepted by the defendant March 13, 1899. The defendant did not signify to Thomas M. Lewis its acceptance of his application in any way other than by making out and forwarding to its agent, S. E. Starn, for delivery the policy sued upon, and the premium receipt hereinafter mentioned, which it did on March 16, 1899.

"On March 18, 1899, S. E. Starn countersigned the premium receipt, and delivered it and the policy sued upon to the insured. The policy and receipt were delivered at the same time and were received by the insured.

" Said premium receipt reads as follows:

" ' Iowa Life Insurance Company.
" ' Chicago office.

" ' Received $74.61, being the first annual premium due March 4, 1899, under policy No. 30,140, on the life of Thomas M. Lewis, subject to the terms of the contract and the conditions on the back hereof.

" ' Read the notice to policyholders on the back of this receipt.
" ' This receipt is not binding unless it is countersigned by
" (Signed)                    ' C. E. MABIE, *President.*
" ' S. E. STARN, *Ag't, Ft. Worth, Tex.*
" ' Countersigned this 18th day of March, 1899.
                              " ' S. E. STARN.'

"(On back of receipt.)

" ' For terms of mutual agreement, see application and policy.

" ' *Notice to Policyholders.*

" ' This receipt, to be valid, must be signed by the president or secretary of the company, and in exchange therefor, cash or its equivalent, be given by the holder of the policy, on or before date payment is due and when payment hereon is made to an authorized agent or collector, such agent or collector must countersign at the date of payment to him.

" ' If note be given for the payment of the premium hereon or any part thereof, and same is not paid at maturity, the said policy shall cease and determine.'

" For the first annual premium, the insured gave the above-described note for $37.30, and agreed to perform professional

services for S. E. Starn to the value of the remaining $37.31. Starn was to furnish professional work to be done by Dr. Lewis in the examination of applicants for insurance and otherwise and Dr. Lewis was to do it and let Starn have the fees. No work ever was done and no money ever was paid to S. E. Starn or the defendant in pursuance of this verbal arrangement. Except that the note was given and the verbal agreement made, as just above stated, the defendant never received, and the insured never paid, anything upon account of the premium for the policy sued upon. S. E. Starn testified that before the issuance of the policy he reported to the defendant his agreement with Dr. Lewis concerning the payment of the premium.

"The policy sued upon is in the form always used by the defendant in making contracts of insurance of the kind designated by its 'ten-year convertible term stock' contracts. At the time of issuing said policy it was the defendant's universal practice to issue with its policies premium receipts in form like the one delivered to the insured in this case.

"The defendant never sold or transferred the note received by it from the insured, but continued to be the owner thereof until the time of the trial. Some time before its maturity the defendant sent said note to S. E. Starn for collection. S. E. Starn deposited it for collection with the Farmers' & Mechanics' National Bank of Fort Worth, Texas, on August 24, 1899. The bank held the note until September 25, 1899, when it returned it unpaid to S. E. Starn. The manager of its collection department testified that it would have accepted payment of the note at any time before its return to S. E. Starn, and that it had received no instructions from S. E. Starn with reference to the acceptance of payment after maturity.

"S. E. Starn made no effort to collect the note before its maturity, except that he deposited it in the bank for that purpose, nor had he, up to that time, furnished any professional work for the insured to do, in pursuance of the verbal agreement, or made any effort to get the insured to do any work, or pay any money on account of such agreement.

"About September 29, 1899, S. E. Starn called at the residence of the insured in Fort Worth (he being at the time con-

fined to his bed from illness, the nature of which was typhoid fever, and from the effects of which he died October 7) and there had an interview with the plaintiff and the insured. Concerning this interview the evidence is conflicting. The evidence introduced by the plaintiff tended to prove that Starn stated that he had called for the purpose of collecting the note, that the plaintiff promised that it should be fixed up at once, and that Starn stated that it could be paid at any time before the date on which he was required to make his monthly report, to wit: October 1 following. The evidence was sufficient to have supported a verdict that this was a fact. Mr. Starn denied that he called for the purpose of collecting the note, and denied that he had made the statement that the note could be paid at any time before October 1, or the date on which he would make his report to the defendant.

"Dr. Green, one of the physicians attending the insured, met Mr. Starn as the latter was coming out of the plaintiff's house. Starn inquired of the doctor if he intended returning to the city after seeing his patient. Being answered in the affirmative, Starn stated that he would wait in the doctor's buggy and go up town with him. While the doctor was in the house the plaintiff requested him to call on J. R. Reeves at the latter's pharmacy and ask him to pay off the insured's note for them, held by Starn; the doctor agreeing to do so. Dr. Green and S. E. Starn rode in the former's buggy from the plaintiff's residence to the business portion of the city of Fort Worth. Mr. Starn left the buggy as soon as the business portion of the city was reached and Dr. Green drove immediately to Reeves' pharmacy and indicated to him the plaintiff's request. Mr. Reeves agreed to pay off the note as requested, and the doctor agreed to notify Starn.

"Concerning the conversation which ensued between Dr. Green and Mr. Starn on the way to town, the evidence is conflicting. Dr. Green testified that Mr. Starn stated that he had called at the plaintiff's house to collect the note. Mr. Starn denied having made such statement.

"Some time during the afternoon of this day Dr. Green notified S. E. Starn that J. R. Reeves, the druggist, would pay

off the note. Concerning the conversation which occurred between Dr. Green and Starn immediately following this notification, the evidence is conflicting. Dr. Green testified that Starn said he would go down to the pharmacy for that purpose; that some statement was made about his going to Reeves' pharmacy to get the money that evening, and that Starn said it would not be necessary, that he would go down by nine or ten o'clock the next morning. S. E. Starn testified that he stated to Dr. Green that he would call and see Mr. Reeves the next morning.

"The night following this interview Mr. Starn sent to the defendant a night-rate telegram, reading as follows:

"'Fort Worth, Texas, September 29, '99.
"'Iowa Life Ins. Co., Chicago:
"'Dr. T. M. Lewis offers to pay premium to-day. Very sick. Shall I receive it?                    S. E. STARN.'

"The next morning, September 30, 1899, the defendant, through its secretary, telegraphed to S. E. Starn as follows:

"'To S. E. Starn, 615 Grove St., Fort Worth, Texas:
"'Do not accept payment on note due September 4. Answer.
"'R. E. SACKETT, Sec.'

"On the same day defendant wrote to S. E. Starn a letter reading as follows:

"'Mr. S. E. Starn, 615 Grove St., Fort Worth, Texas.
"'Dear Sir: We are in receipt of your telegram as follows: "Dr. T. M. Lewis offers to pay premium to-day. Very sick. Shall I receive it?" to which we replied as follows: "Do not accept payment of note due September 4. Answer." We presume this telegram refers to policy No. 30,140, Thomas M. Lewis, $3000, convertible term, premium $37.60, upon which note was received at this office in the sum of $37.30, due September 4, 1899, and which was sent to you for collection.
"'Very truly yours,          R. E. SACKETT, Sec.'

"Some time in the morning of September 30, 1899, S. E. Starn called at the pharmacy of J. R. Reeves, and Mr. Reeves

informed him that he had the money to pay off the Lewis note and had been waiting for him.    Mr. Starn thereupon informed Mr. Reeves that he could not accept the payment of the note because he had received a telegram from the company instructing him not to do so.  Later in the day Mr. Reeves and Dr. Green called on Mr. Starn, and Reeves made a tender of the amount of the note, which Starn refused to accept.  Reeves kept the money he tendered to Starn and did not pay or deliver same to the plaintiff or the insured or to any one for them, and had no interview with the plaintiff or the insured.

" On the same day Starn telegraphed the defendant as follows:

" ' Fort Worth, Texas, September 30th, '99.
" ' Iowa Life Ins. Co., Chicago:
" ' I have refused payment on Lewis policy this 10:30 A. M.
" ' S. E. STARN.'

" The only testimony with regard to any consideration for the promise claimed by the plaintiff to have been made to her by S. E. Starn that he would accept payment of the note is the following passage from the cross-examination of the plaintiff: ' Q. Did you pay Mr. Starn anything?  A. No, sir.  Q. He simply told you he had come to see the doctor about his note, and that it ought to be fixed up, and you said you would attend to it?  A. Yes, sir.  Q. That is all that occurred between you?  A. Yes, sir.'

" The attention of the plaintiff was not directed to the fact that she was being questioned concerning a consideration for the extension of the time for payment of note other than is indicated by the questions put to her.

" At the request of the defendant, S. E. Starn returned to it the note of the insured, which thereafter continued in the defendant's possession.  The defendant never offered to return the note to the insured and never before the death of the insured did anything in the way of an affirmative forfeiture or cancellation of the policy, and no communication passed between the defendant and S. E. Starn regarding said note between the transmission of the note to Starn for collection and Starn's above-quoted telegram of September 29, 1899.

" Except for the evidence upon the question of the extent of S. E. Starn's authority the foregoing is a full statement of all material facts upon the issue of the forfeiture of the policy sued upon for non-payment of the premium note, and the waiver of such forfeiture."

*Mr. Maurice E. Locke* for plaintiff in error.

*Mr. Michael J. Colbert* for defendant in error. *Mr. William Capps* and *Mr. S. B. Cantey* were with him on the brief.

Mr. Justice McKenna, after making the foregoing statement, delivered the opinion of the court.

1. It will be observed that there was printed upon the back of the receipt given for the first premium the following: "If note be given for the payment of the premium hereon, or any part thereof, and same is not paid at maturity, the said policy shall cease and determine." The contention of plaintiff in error is that such provision constituted a part of the contract; and contending also that the note was not paid, it urges that the policy ceased and determined. The same contention was made in the trial court but rejected. The court held that the provision on the back of the receipt constituted no part of the contract, and instructed the jury, against the objection of plaintiff in error, "that the contract by its own explicit terms, is wholly included in the policy—the life insurance proper, and in the application for such life insurance policy, which, by the terms of the policy, is made a part of the contract. This is recited to be the case in the face of the policy and on the back of the receipt itself. *Under the provisions and stipulations of these two instruments, by the passing of the insurance policy to the deceased and the note of the deceased and his promise to pay to the insurance company, the minds of the insurance company and the deceased met, upon the conditions and provisions of the note, contract and the application for the insurance, which made a part of the contract. In the opinion of the court there was no meeting of the minds, or agreement between the parties as to the*

*provision upon the back of the receipt.*   [The italics are ours.]
Such provision is nowhere noted in the face of the contract of
insurance; it is nowhere noted in the application for the insur-
ance, and the only place it is found is upon the back of the
receipt, no reference being made to any such provision else-
where.   Even if the provision were considered a part of the
contract entered into between the parties, yet it is such a pro-
vision that, if taken advantage of, would require affirmative
action on the part of the company; that is to say, when the
note was not paid at maturity the company should have within
a reasonable time thereafter notified the insured that in view
of the fact that his note given in part payment of the premium
upon the policy had not been paid, the policy, which was issued
in consideration of such note, ceased and determined.   There
is no evidence that any such action was taken on the part of
the insurance company."

The court also instructed the jury "that it was the duty of
the company to notify the insured of the non-payment of the
note, and that the policy, because of such non-payment, had
ceased and determined, and that the company would no longer
be liable thereunder."

As these instructions expressed the conception of the law and
the rights of the parties as entertained by the court, the court,
also regarding the conduct of the company as waiving proofs
of death, naturally instructed the jury that it was its "duty to
return a verdict for the plaintiff for the face of the policy," with
interest and penalty, and attorney's fees, as prescribed by the
Texas statute.   "This, therefore," said the court, "leaves to
the jury but one question to determine, the fixing of reasonable
attorney's fees for the prosecution of this suit."

Were the instructions correct?   And first, as to what papers
constituted the contract.

The delivery of a policy of insurance and the payment of
the premium are reciprocal or concurrent considerations.
Necessarily, therefore, the payment of the premium can be
exacted simultaneously with the delivery of the policy.   Of
course, such payment can be waived and a note—the credit of
the assured—accepted, either absolutely or upon conditions.

And we do not see how it can make any difference where the conditions are expressed—whether in the policy, in the note or in the receipt given for the premium, or whether on the face of the latter or on its back. The agreements of parties may be expressed in many papers, and if the connection of the papers is not apparent it may be shown by parole. The present case does not even need the aid of that rule. The receipt expressed the conditions upon which the note was received—unmistakably expressed them. The receipt of the premium was expressed to be "subject to the terms of the contract and the conditions on the back" of the receipt. And the assured was directed to read the notice upon the back of the receipt. The notice was as follows: "If note be given for the payment of the premium hereon or any part thereof, and same is not paid at maturity, the said policy shall cease and determine."

It is not contended that it was not competent for the company to make the condition. It is asserted that it did not become a part of the contract upon which the minds of the parties met—that the minds of the parties only met upon the application, the policy and the note. We cannot assent to this view. The payment of the premium was a very essential thing, and the manner of its payment, whether in cash or by note, and provision for the payment of the note and the effect of its non-payment, were also essential things, and necessarily must have been of mutual concern to the parties and upon which their minds must be considered as having met. To hold otherwise would be to hold that the parties were indifferent to that which materially concerned them. It was certainly of concern to the assured to know whether he would be indebted upon an overdue note or whether his insurance had lapsed.

All of the papers, therefore, embodied the agreement of the parties. In *Insurance Co.* v. *Norton,* 96 U. S. 234, the agreement was considered as "embodied in the policy and the endorsement thereon, as well as in the notes and the receipt given therefor." (page 240.)

2. But determining that the minds of the parties met upon the receipt does not solve the main question in the case. The receipt provides that, if the note, or any part of it, be not paid

at maturity, the policy shall "cease and determine." What does this mean? That the policy shall cease and determine at the occurrence of maturity, or at the option and upon some affirmative action of the company? The latter is the contention of the defendant in error and, as we have seen, the ruling of the trial court; the former is the contention of the plaintiff in error. Upon the issue thus made the cases are not harmonious. The decisions of this court, however, support the contention of plaintiff in error.

In *New York Life Insurance Company* v. *Statham et al.*, 93 U. S. 24, Mr. Justice Bradley, delivering the opinion of the court, said: "Promptness of payment is essential in the business of life insurance. . . . Delinquency cannot be tolerated nor redeemed, except at the option of the company. . . . Time is material and of the essence of the contract. Non-payment at the day involves absolute forfeiture, if such be the terms of the contract. . . . Courts cannot with safety vary the stipulation of the parties by introducing equities for the relief of the insured against their own negligence." The intervention of war was held not to avoid a forfeiture.

This case was quoted and its doctrine announced again in *Klein* v. *Insurance Co.*, 104 U. S. 88; and again in *Thompson* v. *Insurance Co.*, 104 U. S. 252.

In *Klein* v. *Insurance Co.* it was said: "If the assured can neglect payment at maturity and yet suffer no loss or forfeiture, premiums will not be punctually paid. The companies must have some efficient means of enforcing punctuality. Hence their contracts usually provide for the forfeiture of the policy upon default of prompt payment of the premiums. If they are not allowed to enforce this forfeiture they are deprived of the means which they have reserved by their contract of compelling the parties insured to meet their engagements. The provision, therefore, for the release of the company from liability on the failure of the insured to pay the premiums when due is of the very essence and substance of the contract of life insurance. To hold the company to its promise to pay the insurance, notwithstanding the default of the assured in making punctual payment of

the premiums, is to destroy the very substance of the contract."

A forfeiture, of course, may be waived, for the obvious reason expressed in *Insurance Co.* y. *Norton,* 96 U. S. 235, "a party always has the option to waive a condition or stipulation made in his own favor," and an agent can be given such power and whether it has been given or not may be proved by parol.

The latter case is an important one. The policy provided that not only a failure to pay any premium, but "the failure to pay at maturity any note, obligation or indebtedness (other than the annual credit or loan) for premium or interest due under said policy or contract, shall then and thereafter cause said policy to be void without notice to any party or parties interested therein."

The court not only asserted the doctrine of strict punctuality of payment *ad diem,* but applied the rule to a note for part payment.

Expressing its view of forfeitures, the court said: "Forfeitures are not favored in the law. They are often the means of great oppression and injustice. And, where adequate compensation can be made, the law in many cases, and equity in all cases, discharges the forfeiture, upon such compensation being made. It is true, we held in *Statham's* case, 93 U. S. 24, that in life insurance, time of payment is material, and cannot be extended by the courts against the assent of the company. But where such assent is given, the courts should be liberal in construing the transaction in favor of avoiding a forfeiture."

We shall presently consider how far these principles apply to a claim of waiver of forfeiture in the case at bar. Our present inquiry is when and how does forfeiture occur, and it seems an obvious conclusion from the cited cases that forfeiture occurs upon non-payment of the premium *ad diem.* But against the conclusion *Insurance Co.* v. *French,* 30 Ohio St. 240, and its approval by this court in *Thompson* v. *Insurance Co.* are cited.

It was contended in the latter case that the mere taking of notes in payment of the premium was, in itself, a waiver of the conditional forfeiture, and *Insurance Company* v. *French,* 30 Ohio St. 240, was cited to support the contention. To the

contention and citation it was replied: "But, in that case, no provision was made in the policy for a forfeiture in case of the non-payment of a note given for the premium, and an unconditional receipt for the premium had been given when the note was taken; and this fact was specially adverted to by the court. We think that the decision in that case was entirely correct. But in this case the policy does contain an express condition to be void if any note given in payment of premium should not be paid at maturity. We are of opinion, therefore, that whilst the primary condition of forfeiture for non-payment of the annual premium was waived by the acceptance of the notes, yet, that the secondary condition thereupon came into operation, by which the policy was to be void if the notes were not paid at maturity."

A review of *Insurance Company* v. *French* is demanded. Was the reasoning in that case approved or only its conclusion? The policy passed upon contained a provision for forfeiture if the *premium* should not be paid, but no provision for forfeiture if *premium notes* should not be paid. The receipt which had been given was absolute. The provision for forfeiture was contained in the note. The case was somewhat complicated by questions of fact regarding the power of the company's agent to accept the notes or to grant extensions of time, but that the power existed was accepted as concluded by the verdict. The insurance company, nevertheless, asserted as a conclusion from the non-payment of the note that the policy had been forfeited. To this the court (Supreme Court of Ohio) replied:

"In most of the cases which have been cited in argument the policy contained a clause, that it should be void upon non-payment of the premium, or any note given for such premium. This policy, however, contains no clause of avoidance for the non-payment of notes given for premium.

"It is not insisted that the non-payment of the check alone forfeited the policy, but it is claimed that failure to pay the note does work out this result. It will be seen that the note stipulates in terms that, if it is 'not paid at maturity, said policy is to be null and void.'

"It cannot be successfully maintained that this clause makes

the policy absolutely void upon non-payment of the note. Under the authorities such a clause, being introduced for the benefit of the insurance company, means that the policy shall be void if the company insist upon it; but it is their option to say whether this result shall follow or not."

And further—

" We, therefore, cannot consider payment of this note as absolutely necessary before the renewal attached. It may not perhaps be necessary to hold, as did the court below, that demand of payment the day the note was due was necessary to work a forfeiture, but certainly something must be done between the date the note was due and the end of the year to establish and proclaim the forfeiture, or it must be held to be waived."

To sustain the conclusion the following Illinois cases were cited: *Teutonia Life Ins. Co.* v. *Anderson,* 77 Illinois, 384; *Illinois Central Ins. Co.* v. *Wolf,* 37 Illinois, 354; *Provident Life Ins. Co.* v. *Fennell,* 49 Illinois, 180. The court also cited *Joliffe* v. *Madison Ins. Co.,* 39 Wisconsin, 119, and quoted the following principle: " Forfeitures are not favored in the law, and will not be sustained upon mere inferences. Where, upon breach by one party of a condition or stipulation in a contract, the other party thereto has the option to declare the contract forfeited, and thus relieve himself from liability upon it, and seeks to exercise such option, he must do so unconditionally, and in plain, positive, and unmistakable terms." And the court finally concludes that, " in the case at bar, the company should not have retained the check and note, and remained silent, as they did. Yet it appears that on July 6, 1868, when Simpson refused the premium for that year, French offered to give up his policy if the company would return his check and note. This was refused."

What, then, did this court mean by pronouncing the decision in *Insurance Company* v. *French* as " entirely correct ? " Were the various principles the law expressed in that case approved or only the conclusion of the court from the facts? Did this court intend to approve the proposition that to cause a forfeiture some affirmative action was necessary by the company—a

declaration to that effect and the surrender of the premium notes? To hold the latter would be to hold that this court intended to reverse a number of decisions made upon careful consideration. Indeed it would be contrary to the reasoning in the very opinion in which the *French* case is approved. A replication was set up alleging a usage of the insurance company to give notice to the assured of the date of payment and answering it this court said: " This is no excuse for non-payment. The assured knew, or was bound to know, when his premiums became due. . . . The reason why the insurance company gives notice to its members of the time of payment of premiums is to aid their memory and to stimulate them to prompt payment. The company is under no obligation to give such notice, and assumes no responsibility by giving it. The duty of the assured to pay at the day is the same, whether notice be given or not."

And again, as to the usage of the company not to demand punctual payment at the day, or to give thirty days of grace, it was said: "This was a mere matter of voluntary indulgence on the part of the company, or, as the plaintiff herself calls it, an act of ' leniency.' "

In our other decisions, which we have cited, it was held that time is the essence of the contract, and non-payment at the day involves absolute forfeiture. In none of the cases was there any affirmative action by the company. Forfeiture occurred from non-payment of the premium. The same principle was announced and illustrated in *Life Insurance Company* v. *Pendleton,* 112 U. S. 696. In that case a foreign bill of exchange was accepted in payment of the premium, but upon presentation to the drawee was not accepted. There was some controversy as to whether it was presented for payment. The trial court (Circuit Court of the United States) held (7 Fed. Rep. 169) and instructed the jury that the true measure of the duty of the company was to be found in the rules of law governing the holder of commercial paper; that by taking the draft the company assumed all of the duties of the holder of such paper, and that it was, therefore, the duty of the company to have had the draft protested and to have given notice of non-accept-

ance as a condition of forfeiture. This court disagreed with the Circuit Court and held that protest and notice were not necessary. In other words, held, not the law of commercial paper, but the contract of the parties determined the conditions of forfeiture, and that the contract of the parties was expressed in the draft to be that the policy should become void if the draft was not paid at maturity. "We think it clear," was said:

"Therefore, that notwithstanding the renewal receipt, the condition expressed in the draft was binding on the insured. As we have shown, that condition was that the policy should become void if the draft was not paid at maturity. The draft, being without grace, matured on the 14th of October, 1871. If not paid on that day the policy was forfeited, unless it was the usage of the New Orleans banks to grant days of grace even when they were waived, of which there was some evidence on the trial. In such case the forfeiture would take place, if the draft were not paid on the 17th of October. Of course, it must be presented for payment on the one day or the other—for the drawees could not pay it unless it was presented, for they would not know where to find it. But supposing it to have been presented for payment, and payment refused by the drawees, the condition of forfeiture was complete. Protest and notice of non-payment might be further necessary to hold the drawer, if the insurance company desired to hold him; but they were not necessary to the forfeiture. That occurred when non-payment at maturity or presentation occurred. The drawer, Pendleton, who took entire charge of the policy for his children, put its existence on the condition of payment of the draft at maturity; and it was his business, as agent or guardian of his children, to see that the draft was thus paid; that the requisite funds were in the hands of the drawees, or that they would pay it whether in funds or not. Such, we think, was the clear purport of the condition, and as the court below took a different view, holding that the insurance company was bound not only to present the draft for payment, but to have it protested for non-payment, before a forfeiture of the policy would ensue, the judgment must be reversed."

See also same case, 115 U. S. 339.

It has been held in cases in the state courts, as in *Insurance Co.* v. *French*, that no forfeiture is incurred until notice by the company has been given that it is claimed. And other cases hold that when the condition of forfeiture is in the note only, the mere fact of non-payment at maturity does not of itself avoid the policy. A review of the cases we do not consider necessary. We prefer to follow our own decisions.

Some of those decisions hold, however, as we have seen, that a waiver of forfeiture may be inferred from the conduct of the company, and that "courts seize hold of any circumstances that indicate an election or intent to waive a forfeiture." *Insurance Co.* v. *Norton*, 96 U. S. 244.

We do not think such circumstances exist in this case. Of course, such circumstances must have come from the company or from its agent acting within his authority. In the case at bar we need only look at that which took place after the note was given. What preceded that, including the arrangement between Starn, the agent of plaintiff in error, and the assured, for the employment of the latter by the former, must be considered as having been approved by the company. Its rights and the rights of the assured depend, therefore, upon what it did in regard to the note before or after it became due or what Starn did within his authority. The company did nothing but send the note to Starn for collection, and Starn deposited it for collection with the Farmers' and Mechanics' National Bank of Fort Worth, Texas, on August 24, 1898—a month before it was due. The assured did nothing; made no movement, as far as the record shows, for its payment. In other words, the day of maturity came and went, and the note was not paid, and the condition upon which the policy should "cease and determine" occurred, unless Starn's authority lasted and could be exercised after the note became due. He received the note back from the bank on the 25th of September, and on the 29th of September he called at the residence of the assured—the latter then being confined to his bed with typhoid fever (of which he died October 7). The evidence of what transpired there was conflicting, but the record admits would have supported a ver-

dict; "that Starn stated that he had called for the purpose of collecting the note; that the plaintiff promised that it should be fixed at once, and that Starn stated that it could be paid at any time before the date on which he was required to make his monthly report, to wit: October 1st following." And it must also be accepted as true that Starn told Dr. Green that he (Starn) had called at Lewis' house to collect the note, and that the doctor notified Starn that Reeves, the druggist, would pay it, and the latter, on September 30, in the presence of Dr. Green, tendered the amount of the note to Starn, who refused it.

On the 29th of September, as set out in the statement of facts, Starn telegraphed to the company that Lewis offered to pay the premium, and asked if he should receive it. On the 30th the company replied in the negative, and on the same day wrote to Starn. Were Starn's acts authorized? They can only be so held as an inference from the authority given him to collect the note. In other words, that the authority to collect the note conferred authority to extend the time of payment and to waive the forfeiture which had occurred by non-payment. It would be difficult to so hold even if his contract with the company did not forbid the exercise of such power and the provisions of the policy preclude it. The policy provides as follows: "All agreements made by this company are signed by the president or secretary. This power will not be delegated. No other person can alter or waive any of the conditions of this policy, or issue permits of any kind, or make an agreement binding upon said company."

And the contract constituting Starn the company's agent contains the following: "The party of the second part agrees to submit to and abide by all rules and regulations of said company. . . . Agents are not authorized to collect any renewal premium after the day on which the same becomes due, except in accordance with special instructions from the company in each individual case."

There is no evidence of any course of dealing of the company or of Starn which enlarged or modified these instructions, or which induced and excused the default of the assured.

3. The Circuit Court instructed the jury substantially that

the plaintiff in error was estopped from setting up the provision of the policy requiring proofs of death. The instruction is assigned as error. We concur with the Circuit Court. The conduct of the company was tantamount to a waiver. *Life Insurance Co.* v. *Pendleton*, 112 U. S. 696.

4. Notwithstanding our decision in *Mutual Life Association* v. *Mettler*, 185 U. S. 308, the plaintiff in error urges the unconstitutionality of the Texas statute, authorizing the recovery of damages and attorney's fees for failure by life and health insurance companies to pay losses. We are, however, entirely satisfied with the case and its reasoning.

It is insisted, however, that to justify a recovery of the statutory damages demand of payment of the policy before suit was necessary, notwithstanding the denial of liability by the company. The contention is sustained by the decision of the Court of Civil Appeals of Texas in the case of the *Northwestern Life Assurance Co.* v. *Sturdivant*, 24 Tex. Civ. App. 331. That case also decided " that the suit itself would not be such demand as the statute intended." It was held, however, that demand could be made after suit and set up by " an amended petition, as an original suit." The Supreme Court of Texas refused a writ of error to review the case. 94 Texas, 706. We may therefore adopt its construction of the state statute. It can be easily conformed to by defendant in error if a new trial of the case at bar be prosecuted.

On account of the errors indicated

*The judgment of the Circuit Court is reversed and the cause remanded with directions to award a new trial.*