Isabella McCoy, Appellant, v. National Life Insurance Company, Appellee.

INSURANCE: Soliciting Agent—Nonauthority to Waive Policy Requirements. An agent whose authority is limited to the act of *taking applications* for insurance necessarily has no authority to bind the insurer to a construction of the policy, or to waive any provision thereof. So held as to the effect of the insured's entering military service.

*Appeal from Union District Court.*—P. C. Winter, Judge.

MAY 3, 1921.

Rehearing Denied October 1, 1921.

Action at law to recover $1,000, the face value of a life insurance policy issued by defendant on the life of Clarence D. McCoy, plaintiff's husband. The insured was in the military service, and was killed in action in France. Defendant claims that it had no notice that insured was in the military service. The policy contained a military clause, but insured had not paid the additional premium, as agreed in the contract, and had not obtained a written permit for military service in time of war. Appellant claimed that there was a waiver of these matters on the part of the company, through its agent. Without such permit, the liability of the company was limited to the reserve, which amounted to $9.38. The defendant, in open court, made an offer of compromise, under the statute, and to allow judg-

ment to be taken in the sum of $10. At the close of plaintiff's evidence, defendant moved the court to direct the jury to return a verdict for plaintiff in the sum of $9.38, on the grounds that plaintiff had failed to offer sufficient evidence to sustain a finding by the jury that the provisions of the military clause had been waived; that Carr and Rath were not shown to be agents of the company, clothed with any power to waive any provisions of the policy; and that there was no evidence before the court to sustain a verdict for more than the amount stated. The motion was sustained, and judgment rendered for defendant. The plaintiff appeals.—*Affirmed.*

*Brown & Ferguson,* for appellant.

*Thomas L. Maxwell, A. Ray Maxwell,* and *L. A. Stebbins,* for appellee.

Per Curiam.—There is no dispute on the controlling facts, the controversy being as to the fact of agency, and the authority of the agents, if any, and as to whether there was any waiver of any of the conditions of the insurance contract.

The petition alleges substantially as follows: Defendant is an incorporated insurance company, with its principal place of business at Chicago, Illinois, and engaged in the business of writing insurance, in compliance with the laws of Iowa. On June 8, 1918, defendant, through its duly authorized agent, Carr, solicited deceased to take out insurance in the sum of $1,000, on the 20-payment-life-endowment plan. Deceased did submit an application therefor, which was submitted to defendant by said Carr, and the application accepted, and on said date the company issued and delivered their policy to him. At that time the occupation of deceased was that of a bridge tender; but, on July 1, 1918, he changed his occupation to that of a railroad fireman, and notified defendant, through its agent Carr, thereof, and defendant, through said Carr, took up the policy, for the purpose of attaching thereto the special provision authorizing such change, and such provision was attached to and made a part of the policy. The policy, so amended, was delivered to plaintiff, the beneficiary and the wife of deceased, July 31, 1918. At the time, the amendment to the application was made out by said agent Carr, and offered to plaintiff for the purpose of

signing the name of deceased, which was done by her. When the original application was submitted by deceased, on June 8th, the premium for the first year was paid by a note delivered to Carr by deceased, payable August 8, 1918, to the order of Carr, for $37.55. On July 21, 1918, deceased was inducted into the military service of the United States, and remained therein until November 3, 1918, when he died while in the service of the United States in France, and was buried there. During all the time from June 8th to November 3d, deceased complied with all the conditions and provisions of the policy, except that provision which provides that, in the event that the insured serves in the military or naval service in time of war, a permit will, on written request and on payment of the extra premium charged therefor, be granted for military or naval service in time of war. Deceased had not complied with the terms of the policy as to this provision, for the reason that defendant, through its agent Carr had, as appellant contends, orally waived, by acts and statements, compliance with said provision, which acts and statements are that, at the time the policy was taken up by its agent Carr, to amend it because of the change of occupation to fireman, plaintiff, acting as the agent of deceased, told Carr that insured was about to be inducted into the military service, and requested him to inform her of the additional premium necessary to be paid by deceased while in said service, and offered to submit a written application for a permit, as provided in the policy; and that said agent informed her that defendant was not relying upon said clause in said policy, and that no written application for permission was necessary, and that defendant was not charging any additional premium to cover risk while insured was in such service. On July 31, 1918, defendant, through its duly authorized agent Rath, delivered the policy, with the amendment before referred to, to plaintiff, as agent for insured, and refunded to plaintiff, as his agent, the sum of $...., difference in premium to insured when engaged in the less hazardous occupation. The petition further alleges that, at the time said policy was delivered, insured was in the military service, and this fact was known to said agent; that plaintiff, as agent for insured, again offered to pay the extra premium and to comply with the provisions respecting military service; but that said agent of

defendant, at the time and as a part of the transaction of delivery of the policy, stated that said defendant was not relying on said clause, and was making no extra premium charge for military service; that, by virtue of the authorized acts and statements of defendant's said agents, defendant has waived compliance with the provision in the policy in this regard; and further, that defendant, through its duly authorized agents, has sought to mislead plaintiff, as agent of insured, and is estopped from relying on the clause in question; that said acts and statements were such as were calculated and intended to, and did, prevent insured from compliance with said clause; that, when notice of the death of insured came to plaintiff, she complied with the provisions of the policy as to requesting blanks for making proof of death, and in her said request stated that deceased had been killed or died while in the military service in time of war; that thereupon defendant, without waiting for proof of death, denied all liability under the policy, and refused to pay; that, since plaintiff deemed it unnecessary to comply with that provision, she did not do so, and alleges that defendant waived proofs of death; that she has requested payment and offered to submit proofs of death, in compliance with the policy; but that defendant has refused to pay.

The provisions of the policy as to securing permit for the military service and additional premium have been sufficiently set out. Other provisions in the policy which appellee deems of some importance are:

"This policy, together with the application therefor, a copy of which is hereto attached and made a part hereof, shall constitute the entire contract between the parties hereto. All statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties; and no such statement shall avoid this policy unless it is contained in the written application therefor, a copy of which application is attached hereto.

"Agents are not authorized to alter or modify this policy of insurance, or extend the time for the payment of any premium. All premiums are payable at the home office, but will be accepted elsewhere if paid to an agent in exchange for a receipt, signed by the president, vice president, secretary, or

actuary, and countersigned by the agent designated thereon. This insurance is granted upon condition that all premiums be promptly paid when due, and failure to pay any premium, or any part thereof, when due, shall forfeit and cancel this contract and terminate all obligations of the company under this policy, except as herein otherwise provided. No act or series of acts upon the part of the company in sending premium notices and accepting premium payments after maturity shall constitute or evidence a waiver of the provisions of this paragraph.

"This policy shall be incontestable one year from its date except for nonpayment of premium and except for a violation of its conditions in regard to the military or naval service in time of war. The insured may serve in militia in time of peace, or for the purpose of preserving order in case of riot, but in time of war a written permit must be obtained from the company for military or naval service. In case of death of the insured while engaged in or as a result of military or naval service in time of war, without such permit, the liability of the company shall be limited to the reserve hereon."

The special provision in the contract for changing occupation to fireman, which is dated June 8th, provides, among other things, substantially that, if the occupation of insured is changed from fireman, and he shall thereafter engage in an occupation not requiring an extra premium, then, upon furnishing evidence of such change, the annual premium shall be reduced; and that, if insured should thereafter re-engage in the occupation of fireman, and the company be notified, the payment of such extra premium should be resumed; and should said insured resume such hazardous occupation and fail to notify the company and pay the extra premium, and death should occur while the policy is in force, as a result of such occupation, then the amount for which the company shall be liable is to be the amount of premiums actually paid, provided, such amount shall in no case exceed the amount for which it would have been liable if this special provision had not been issued; and further, that, in all other respects, the conditions of the policy shall remain unchanged. The amendment, dated July 31, 1918, signed by the insured, makes but one change, as follows:

"Part One, Question 6A: Occupation should read 'Railroad fireman, on freight or mixed trains', instead of 'Bridge tender.'"

The other part of the amended application provides that these amendments and declarations are to be taken and considered as a part of the said application of June 8th, and subject to the agreements, warranties, and representations therein contained; and that the said application and these amendments are to be taken as a whole, and considered as the basis of the contract for insurance. It seems to us there is some confusion in the record in regard to these dates. Under the evidence, Carr and Rath called for the original policy, to make this change in regard to occupation, about July 1st, and the amended or new policy was delivered on July 31st. At that time, the insured had been inducted into the military service. Mrs. McCoy testifies that her husband left Creston on July 22d.

The answer denies all allegations except such as are admitted, which include the corporate capacity, the application of deceased, the issuance of the policy pursuant thereto, the application for modification to show change of occupation to fireman, and the adjustment of the annual premium, according to defendant's rates for such changed occupation. It states, also, that said application for modification was assented to by defendant, and a new policy issued, showing the occupation of insured, and that premium was returned in accordance with the change. It also admits the death of deceased, as stated. Further answering, defendant expressly denies that insured complied with all the conditions and provisions of said policy which were to be kept and performed on his part, and avers that it was expressly provided in said policy as follows (provisions before quoted); denies that he complied with the foregoing provisions; and states that he never made any written request for a permit to engage in the military service, or made payment of the extra premium, and so on; alleges that insured died while engaged in and as a result of his military service, without having such permit; denies liability other than as expressly provided in above provisions; denies that defendant or any of its authorized officers or agents ever waived, in any manner, such failure of insured; denies that Carr and Rath, or either of them, had any

right, power, or authority to waive any of the provisions of the policy; admits that it was informed of the death of insured and the circumstances thereof, and that it denied liability; and says that no proofs of loss were required by defendant.

It was stipulated on the trial that insured was killed in action in France, as stated, and as a result of military service in time of war; that the total reserve on the policy on November 3d amounted to $9.38; that insured was inducted into the military service of the United States on July 2, 1918; that, on July 31, 1918, William Rath delivered the policy in suit to plaintiff, who received the same as agent of insured; and that, at the same time that the delivery was made, the same person delivered to plaintiff, as agent of the insured, the sum of $2.50, which represented the difference in the premium charged for the risk under this policy and the premium charged for the risk under the former policy issued.

Omitting the matters testified to by plaintiff as a witness which are admitted, she says:

"Was the wife of insured June 8, 1918, when Carr and Rath called at our home at Creston, to sell my husband insurance. Insured was 28 years old then. Wasn't present when they first came, but came in later. Heard the biggest part of the conversation. Rath did all the writing on the application. Did not hear any conversation relative to military service. Rath was taking an active part in soliciting insured; was doing most of the talking. He was using selling talk. Carr was sitting there, looking on, permitting Rath to take active charge. Rath delivered the policy before July 1st. I had no conversation with him at that time, when it was first delivered. The note given when the application was written up has been paid. Shortly after July 1st, Carr and Rath came out after the policy, to make the change. No one else present. Had a conversation with them at that time about the military clause. I asked Carr about it, and he said, 'Mrs. McCoy, that is all right'. We noticed the military clause after we got the policy; did not know of it when it was applied for. June 8th, my husband was in the draft, expecting to be called at any time. He took out this application for insurance, knowing that he was going into the military service. After we got the policy, I read it, because

I had been selling insurance, and it was natural to look over policies. As a result of my having read the policy and knowledge of the insurance business, I was particularly interested in that military clause, and that prompted me to ask the question when they came after the policy.''

Over objection by defendant, and the promise by plaintiff that they expected to show authority in the agents, she testified that Carr is the one who made the statement concerning the military clause, and that she took the statement as truthful, and relied on it. She testifies further that she received a policy from defendant the second time on July 31st, when her husband was in the military service at Camp Pike, Arkansas; that Rath delivered the policy, and she had a conversation with him in regard to her husband's being in the military service. Over like objection and promise, she testifies that she asked him whether he knew that her husband was in Camp Pike, and he said, ''You will do just as well to sign the paper.'' She then asked him about the military service clause, and told him that her husband expected to sail most any time, and he said: ''Never mind, Belle, the policy is all right, and he would not have to pay any more money.'' Carr was not present. She knew that Rath was engaged as an agent of defendant company; he wrote up her two brothers, the year before, and two neighbors, prior to writing her husband. The reason the additional premium was not paid and the permit asked was because Carr and Rath told her it was all right; that it was not necessary.

''Was well acquainted with Rath; he was employed as chief clerk in the master mechanic's office on the same railroad that my husband was working for. Known him for a long time, and been friends for years. Had no reason to distrust him. I asked him about it for information. Would have taken it up with the company, if I had not relied on his word. Insured wrote me a letter from New Jersey, September 25, 1918, that he was ready to sail any time. Do not know what conversation he had with Rath or any of these people about the insurance policy. Saw the clause in regard to the military service, and knew from my experience that, if that clause was not waived, it would prevent me from getting insurance in case of his death. I understood that my husband never made application for a permit or paid

any additional premium. I did not pay any attention to the clause in the policy, 'Agents are not authorized to change or alter this policy of insurance.' "

W. W. Carr, testifying for plaintiff, says:

"Live in Des Moines, Iowa; life insurance agent; represent defendant. My territory is south and southwestern Iowa, and most any territory in Iowa not occupied by some other agent. Am not what is known as a state agent,—we haven't any. I have authority to appoint subagents and have them appointed in different parts of the state. Those I appoint work under me. I visit these subagents and help them in securing insurance. Rath was not a subagent. I have no subagent in Creston. He works for me in soliciting insurance, assisting me. He was assisting me in the summer of 1918. I hired him to help me. That would not constitute a subagent. I paid him for what business he did, a commission, the same as I would pay any banker, or anybody else. My subagents are paid a straight commission on a contract with the company, signed by the secretary of the company. I get a share of the commission and policies written by subagents on the first premium. When I went to Creston, at times Rath would go out with me, sometimes in the evening. He would have the prospects looked up, have them in mind, and take me. I almost always delivered the policies. Trusted Rath to deliver some, on my authority,—not over two or three,—not sure as to the exact number. I was working pretty much all over the state. Most every place, we have a regularly appointed agent, recognized by the company. I had Rath working for me because he is in a position, with the railroad, to secure a good many prospects. He has done a good deal of the talking with prospects, and I allow him to fill out the papers for my signature, but not my signature. He wrote the policy in suit and delivered it with my consent. The company has no knowledge of Mr. Rath being an agent. Rath has assisted me in procuring over $100,000 insurance around Creston. When an agent is appointed through me, there is a written contract, which is subject to the approval of the company and signed by the secretary before it becomes effective. All agents I have recommended, and I myself, operate under a written contract of agency. There never was any appointment of Rath. One inducement for my

employing him to assist me was that he was well acquainted. It is a railroad town, and he was in the railroad office. I stopped at Creston longer than I would in a town which was not a railroad town. The company did not know Rath in this matter. After the application was written, I signed my name on it, and sent it to the company. I always send it to the Des Moines office, and it would be sent out from there, as all business was transacted from there. The policy would come from the Des Moines office. This particular policy I mailed to Mr. Rath to deliver to McCoy after it was approved,—either that or gave it to Rath,—at any rate, it reached Rath through me, and not through the company. The only time I saw insured was at the time the application was taken. My duties are to solicit insurance, take the written applications, and transmit them to the company. I have no authority to pass upon and accept or reject applications; my duty is simply transmitting applications. I have nothing to do with the issuing of policies or the changing of policies or the changing of rates or the terms of policies in any way. When the applications are forwarded, if approved and the policy is issued, then I deliver the policy back to the insured. That is the limit of my authority. I never attempted to give Mr. Rath any authority to do anything more than to solicit applications through me, and he was doing it for me. I have authority to collect premiums when I take an application. I do not collect any premiums after the first one. There is a cashier at Des Moines that transacts that business. They are sent to the Des Moines office of the company. It is not my office. I make it my headquarters. I am not paid extra for looking after the premiums that I do look after. I do that in consideration of my subagency. The premiums are collected by the company through its Des Moines office. There are parties there who do that. I receive no compensation for that. I am not in charge of the office. The cashier has charge of the office, whether I am absent or present. It is the company's office. There was formerly a general agent. It ceased in 1919. Since then there has been no general agent in this state.''

William Rath, testifying for plaintiff, says:

''Live in Creston; chief clerk, etc., in the railroad office. Sometimes sell some insurance for the Prudential Life. Never

sold any for defendant, only in company with Carr. Was with him when this policy was taken. Carr was always present when the applications were written. I did the clerical work in writing some of the applications. I did not sign anything. Carr was teaching me the business. He was not present when I delivered the amendment to this policy. I wrote up the application and made out the premium note. When I delivered the amended policy, I knew that insured was in the military service. I don't know that I was in anybody's employ. The arrangement was between Carr and I, that I was to secure the prospects and he to write them. I had no correspondence with the company; was not known to them, so far as I know; was never appointed their agent. I got the amended policy which I delivered in July from Carr. There was some money paid back,—$2.50 I believe,—and that came from Carr.''

Defendant introduced no evidence, and the above is all the evidence for plaintiff, set out somewhat fully.

Carr and Rath do not deny plaintiff's testimony as to what they told her in regard to the permit and additional premium. It is undisputed, then, that they did tell her that. As to the scope and authority of the agency, the evidence depends almost entirely upon their testimony. Appellant cites several cases to the proposition that knowledge to an agent authorized to deliver a policy of insurance at the time of the delivery is knowledge to the company. We understand appellee to concede that, so far as mere notice or knowledge that the insured was about to enter the military service, or that he had done so, is concerned, the company would be bound. We take it this would apply more especially to Rath, who says he knew, when the new policy was delivered, about July 31st, that insured had been inducted into the service. But Rath was not known to the company, and was only in the employ of Carr. We do not understand plaintiff to claim that Carr knew that the insured had been inducted into the service, and the only notice to or knowledge of Carr was as to the future intentions of the insured; and the evidence as to what he said was a mere unauthorized statement, the effect of which was either to interpret the policy or to alter its terms, or both. The talk with Carr, testified to by plaintiff, was about July 1st, and insured had not then been inducted into the

service. Insured was then in the draft, and was expecting to go into the service at any time, and the policy was taken out with that in view; but she did not tell Carr this. If it be thought that, because of the age of insured, he was likely to be called into the service, then it should be considered that he was also engaged in railroading, and that such employees were exempt. While appellee makes the concession before stated, as to knowledge of the company at the time the application was prepared and accepted, it contends that it is not bound by statements made outside of the scope of authority; and that to construe or interpret a policy issued or to be issued was no part of the duty of either Carr or Rath; and further, that the statement testified to by plaintiff, that it was not necessary to pay any additional premium or secure a permit, is contrary to the express terms of the policy, which were known to the insured and to the plaintiff, and the policy accepted by them with such knowledge, without objection; that this would involve the making of a new contract, an act on the part of the company, which neither Carr nor Rath had any authority to do. It is true, as contended by appellant, that, under the statute, soliciting agents are agents; but this is only for some purposes. Other cases are cited, as to the authority of a general agent. The question is, however, whether, under the undisputed evidence, Carr or either of these men was a general agent. Plaintiff has the burden to show that they were. It seems clear to us that they were not such, and the evidence shows that they had no authority to change the contract or to waive its express provisions. There was nothing ripe upon which a waiver could operate, in the sense contended for by appellant. The insured was not in the military service at the time the policy was delivered. The amendment or special provision had reference only to the change of occupation from bridge tender to fireman, and the consequent reduction in the amount of the premium, and not to the military undertaking, more hazardous than either of the others, and the increased premium required by the policy. All other provisions, including those under discussion, remained the same. After all, the effect of appellant's contention is, as we understand it, that a new contract was made between plaintiff, as agent for the insured, and Carr and Rath, when they said to her that it was not neces-

sary to secure a permit or to pay an additional premium, thus changing the express terms of the contract. We take it this is what they mean when they cite *Braden v. Randles,* 128 Iowa 653, as holding that an agreement, when changed by mutual consent of the parties, becomes a new contract. But there must be authority to make such new contract. Other cases are cited to the proposition that a new agreement takes the place of the old, and that the remedy must be on the new contract, and not on the old one. Appellee cites numerous cases on the different propositions. The opinion is already too long, and we shall not attempt a review of the cases, but content ourselves with citing them, and rely upon the facts which have been fully stated. To the proposition that there is no competent proof of agency or sufficient proof of authority, and that the agents were not properly authorized to waive conditions of the policy, they cite *Worsley v. Ayers,* 144 Iowa 676; *Anderson v. Patten,* 157 Iowa 23; *Reichart v. Romey,* 167 Iowa 252; *Jolley v. Doolittle,* 169 Iowa 658. As to soliciting agent's authority they cite *Miller v. Illinois Bkrs. L. Assn.,* 138 Ark. 442 (7 A. L. R. 378); *Murphy v. Continental Ins. Co.,* 178 Iowa 375; *Kirkman v. Farmers' Ins. Co.,* 90 Iowa 457, 459; *Ruthen v. American F. Ins. Co.,* 92 Iowa 316, 325; 25 Cyc. 860, 861; *Iowa L. Ins. Co. v. Lewis,* 187 U. S. 335; *Elliott v. Frankfort M., A., & P. G. Ins. Co.,* 172 Cal. 261 (L. R. A. 1916F, 1026). To the proposition that all agreements between the agents and the assured were merged in the policy, they cite *Murphy v. Continental Ins. Co.,* supra; *Phillipy v. Homesteaders,* 140 Iowa 562; *Iowa B. M. B. & L. Assoc. v. Fitch,* 142 Iowa 329. That the agents have no authority to interpret the meaning or provisions of the policy, and that such authority will not be presumed, but must be proven, they cite *Murphy v. Continental Ins. Co.,* supra; *Dryer v. Security F. Ins. Co.,* 94 Iowa 471; *Cornelius v. Farmers' Ins. Co.,* 113 Iowa 183; *Miller v. Assoc.,* 138 Ark. 442 (7 A. L. R. 378). And further, that the policyholder must be held to know all the conditions and provisions of an executed and delivered contract, they cite *Sowers v. Mutual F. Ins. Co.,* 113 Iowa 551; 25 Cyc. 723, 861; *New York L. Ins. Co. v. O'Dom,* 100 Miss. 219 (1914 A Ann. Cas. 583, 589); *McElroy v. Metropolitan L. Ins. Co.,* 84 Neb. 866 (23 L. R. A. [N. S.] 968); *Penman v. St. Paul F. &*

*M. Ins. Co.*, 216 U. S. 311. They contend, also, that defendant is not estopped to claim exemption from liability, because the policy was accepted by the insured and the plaintiff, without objection; and that appellee had no notice of the future intentions of the insured. To the first of these two points, they cite *House v. Security F. Ins. Co.*, 145 Iowa 462; *Sowers v. Mutual F. Ins. Co.*, supra; *Slocum v. New York L. Ins. Co.*, 228 U. S. 364; *Gish v. Insurance Co.*, 16 Okla. 59 (13 L. R. A. [N. S.] 826); 25 Cyc. 723. And to the second proposition, *Sowers v. Mutual F. Ins. Co.*, supra; *Wensel v. Property Mut. Ins. Assn.*, 129 Iowa 295, 299; *House v. Security F. Ins. Co.*, supra; *Insurance Co. v. Wolff*, 95 U. S. 326. In the *Wensel* case, we said that knowledge of a soliciting agent of the future intentions of the insured as to violating some of the conditions of a policy as written is not binding upon the insurer, and cannot be relied upon for the purpose of avoiding the terms and conditions of the policy as issued, citing the *Sowers* and other cases. The *Wensel* case and other cases are distinguished in *Scrivner v. Anchor F. Ins. Co.*, 144 Iowa 328, 331.

On the facts, and without enumerating them, we think the distinction is against this appellant's contention. Other cases are cited as holding that the military clause in question was a reasonable provision, and that appellant had notice thereof, as well as of the clause in the policy limiting the authority of agents; and that such clause is one of exemption from payment, and not of forfeiture of contract. We do not understand appellant to contend otherwise.

For the reason given, the judgment is—*Affirmed.*