EQUITABLE LIFE ASSUR. SOCIETY OF UNITED STATES v. ELLIS.†

(Court of Civil Appeals of Texas. June 29, 1910. Rehearing Denied Nov. 3, 1910.)

1. TRIAL (§ 139*)—DIRECTED VERDICT—WHEN AUTHORIZED.

To justify a directed verdict for defendant, the evidence must be such that there is no room for ordinary minds to differ as to the conclusion to be drawn from it.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 338; Dec. Dig. § 139.*]

2. APPEAL AND ERROR (§ 1005*) — VERDICT—CONCLUSIVENESS.

A verdict justified by evidence and sanctioned by the trial judge will not be disturbed on appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3498; Dec. Dig. § 1005.*]

3. INSURANCE (§ 358*)—AGENTS — POWERS—PAYMENT OF PREMIUM—EXTENSION OF TIME.

A cashier of an insurance company officing with general agents having as their territory some 40 counties in the state, or with the general manager for the larger part of the state, empowered to collect premiums and order the return of policies for nonpayment of the first premium, and with whom policy holders can only deal with respect to the payment of premiums, may be deemed to have authority to extend the time of the payment of an annual premium due on a policy, stipulating that it shall lapse on the nonpayment of any premium when due, especially where the general agents referred insured to the cashier in response to a request for an extension of the time of payment in the absence of any limitation on his powers.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 915; Dec. Dig. § 358.*]

4. PRINCIPAL AND AGENT (§ 120*)—POWER OF AGENT—EVIDENCE.

Where the relation of principal and agent is established and the scope of the agency is in issue, the authority in fact exercised by the agent may be considered in the absence of any fraud, especially where the principal does not show the scope of the agent's power nor want of knowledge of the agent's exercise of power.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 409; Dec. Dig. § 120.*]

5. CORPORATIONS (§ 400*)—AGENTS—POWERS.

A corporation can act only through its agents, and general limitations on the power of an agent will yield to the power actually exercised by him with knowledge and acquiescence of the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1590; Dec. Dig. § 400.*]

6. INSURANCE (§ 665*) — LIFE INSURANCE — POWER TO EXTEND TIME FOR PAYMENT OF PREMIUMS—EVIDENCE.

In an action on a life policy, evidence held to justify a finding that an agent of insurer had authority to extend the time of payment of premiums, and actually extended the time of payment so as to prevent a forfeiture of a policy, though it declared that it would lapse on nonpayment of any premium when due.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 665.*]

7. INSURANCE (§ 664*)—WAIVER OF NONPAYMENT OF PREMIUM AT MATURITY—EVIDENCE.

Where the insurer in a policy stipulating that it should be void on nonpayment of any premium when due relied on the nonpayment of a premium at maturity, the acts of its agents, though without authority to delay the collection of premiums or to receive past-due premiums, or to negotiate loans by insurer to pay such premiums, in dealing with insured by extending to him time for the payment of a premium and negotiating loans to pay the same, were admissible to show a waiver by insurer of the forfeiture for nonpayment of a premium.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1687; Dec. Dig. § 664.*]

8. INSURANCE (§ 349*)—NONPAYMENT OF PREMIUMS—EFFECT.

A failure to pay a premium at maturity forfeits the policy, where it declares that it will lapse on the nonpayment of any premium when due, in the absence of any other controlling condition.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 891; Dec. Dig. § 349.*]

9. INSURANCE (§ 372*)—NONPAYMENT OF PREMIUMS—WAIVER OF FORFEITURE.

The insurer in a policy declaring that it shall lapse for the nonpayment of any premium when due may by its election avoid a forfeiture and keep the policy in force.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 941; Dec. Dig. § 372.*]

10. INSURANCE (§§ 388, 390*)—NONPAYMENT OF PREMIUMS—WAIVER OF FORFEITURE.

A waiver of the forfeiture of a life policy, stipulating that it shall lapse on the nonpayment of any premium when due, results from negotiations or transactions with insured after knowledge of the forfeiture, by which insurer recognizes the validity of the policy, but a waiver may not be inferred from mere silence.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1026, 1037; Dec. Dig. §§ 388, 390.*]

11. INSURANCE (§ 665*)—LIFE INSURANCE—NONPAYMENT OF PREMIUM—WAIVER OF FORFEITURE—EVIDENCE.

Evidence held to justify a finding that insurer, issuing a life policy, waived its forfeiture for nonpayment of premium at maturity.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 665.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

† Writ of error granted by Supreme Court.

12. INSURANCE (§ 665*) — LIFE INSURANCE— NONPAYMENT OF PREMIUM—WAIVER OF FORFEITURE—EVIDENCE.

In an action on a life policy, evidence *held* not to show that insured obtaining an extension of the time of the payment of an annual premium, and dying before payment, would not have paid the premium had he lived, and insurer, waiving a forfeiture for nonpayment of the premium at maturity, could not defeat a recovery on the policy.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 665.*]

Rector, Special Associate Justice, dissenting.

Appeal from District Court, Travis County; Geo. Calhoun, Judge.

Action by Amanda M. Ellis against the Equitable Life Assurance Society of the United States. From a judgment for plaintiff, defendant appeals. Affirmed.

Ogden, Brooks & Napier, for appellant. James H. Robertson, Alexander Graves, and John C. Sullivan, for appellee.

BARBER, Special Chief Justice. This is an appeal from a judgment rendered in the district court of Travis county October 1, 1908, in favor of Mrs. Amanda M. Ellis, the mother of Caswell G. Ellis, on a policy of insurance in the sum of $25,000 upon the life of the latter, issued by appellant and payable to Mrs. Ellis. The trial was before a jury, who found for appellee, and the substantial question in the case is whether there was sufficient evidence to carry the case to the jury for determination.

The inception of the transactions giving rise to the controversy is an application made by Caswell G. Ellis to appellant on March 24, 1904, through its general agents Marx & Plummer, of San Antonio, for two policies of insurance upon his life, in the sum of $25,000 each, one to be payable to his wife and the other to his mother. The company issued the policy sued upon in favor of the mother on April 16, 1904, but making the premium fall due each year on March 24th. Ellis died on May 12, 1906, as result of gun shot wound received the day before. The premium which became due March 24, 1906, according to the reading of the policy, had not been paid, and such failure was properly pleaded by appellant, the company, and constitutes its only defense. The specific provision of the policy on the point, as correctly pleaded, was: "This policy shall lapse, and together with all premiums paid thereon shall forfeit to the society on the nonpayment of any premium when due." To avoid the effect of this, appellee pleaded, among other things, with minuteness, facts relied upon by her as estopping appellant to rely upon such failure, and as showing that it had waived any forfeiture of the policy. It developed in the testimony, as indicated by the pleading, that these matters of avoidance urged by appellee rested largely upon

or were evidenced by correspondence had by Ellis with Bourke, the cashier of appellant at San Antonio in 1905, and with Wyman, its cashier, at Austin in 1906. Their authority in the premises was denied by appellant, and it invoked another clause of the policy which read that the "policy and the application therefor, taken together, constitute the entire contract, which cannot be varied except by one of the following executive officers of the society at its home office in New York, viz.: The president," etc., naming several officers, but not including the superintendent of the loan and extension department, hereinafter referred to. Under the charge of the court, the jury must have found for appellee more facts than we think necessary for her recovery. Their verdict involves a finding that any forfeiture or right to forfeit was waived, and that the acts of Wyman and others relied upon were within the scope of their employment and therefore the acts of appellant. As we have reached the conclusion that there is sufficient evidence to support these findings, there is no occasion to consider any other.

[1] The sufficiency of the evidence to authorize these two findings is presented under the first assignment of error, which complains of the refusal of the trial court to charge the jury to find for appellant. To have been justified in so doing, "the evidence must be of such character that there is no room for ordinary minds to differ as to the conclusion to be drawn from it." Lee v. Railway, 89 Tex. 588, 36 S. W. 63.

[2] It matters not what we might think as an original proposition. Twelve men have exercised the functions accorded them and their conclusion had the sanction of the trial judge. That there was permissible grounds for the deductions they drew we think the record here affirms. The question as to whether the acts and letters of Wyman, Bourke, and Brophy could be considered against appellant upon the issue of waiver, and then whether there was enough to show a waiver, are so intimately connected under the peculiar facts of this case that we will not attempt to separate our discussion thereof.

[3] It is admitted that during all the time under consideration R. H. Baker was appellant's general manager for the larger part of Texas, with his office at Austin; that Marx & Plummer were its general agents at San Antonio, their territory embracing some 40 counties; that during 1905 W. H. Bourke was its cashier at San Antonio, officing with Marx & Plummer, and that all the while James H. Wyman was such cashier at Austin, officing with said R. H. Baker. The direct evidence of the powers and duties of the two cashiers is meager. In the contract with Baker and with Marx & Plummer as general agents, there is a provision that the

society reserves the right to appoint a cashier to keep the accounts and make collections. He is to keep exclusive control of all policies, renewal receipts, and other vouchers, "subject to the rules of the society and the instructions given by its principal officers." The general agent may collect a first premium, but must remit it to the cashier, and the cashier may order return of policies where the first premium has not been collected. It is fair to assume that parties occupying such responsible positions had written contracts carefully defining their powers and duties; yet, with the pleading of appellee specifically charging a waiver by these cashiers, appellant produces no contract, and offers not even the parol testimony of any executive officer, to show what powers were in fact confided to them, or what powers they ordinarily exercised. It has always been ruled that failure to produce testimony peculiarly within the knowledge and control of a party is proper matter for consideration by a jury.

We gather from the reservation in the general agents' contract that the cashier would be subject to certain "rules of the society" and to "instructions" to be given by its principal officers. If those rules and instructions would have supported appellant's contention that its agents were, in their dealings with Ellis, exceeding their "instructions," we are prepared to believe their very able counsel would not have left the matter open to conjecture or speculation. That these cashiers had power to appoint agents to collect or receive premiums appears from the notice sent to Ellis, as required by law, calling attention to the premium to mature March 24, 1906. He is there told he may pay same to James H. Wyman, cashier, Austin, "or to such person as he may duly appoint." His power was certainly not ministerial, nor his duties those calling for the exercise of no discretion. He is the sole representative of the company as to the very important matter of collecting premiums. He is the only person with whom the policy holder can deal. He is put there as the company's representative touching all matters incident to collecting the premiums. He may deal with the insured in person or by his selected representative. That the matter of extension of premiums pertained to them is indicated by the general agents, Marx & Plummer, and the general manager, Baker, referring to the cashier the request for an extension made by Ellis.

[4] While the fact of agency may not be shown alone by the acts or declarations of the alleged agent, yet, when the relation is established and the scope thereof is under inquiry, then, in the absence of fraud, we see no good reason why the authority in fact exercised may not be considered. This particularly where the principal offers no testimony as to the exact scope of the agent's

power, and does not offer to show want of knowledge of the exercise thereof. Here, on March 12, 1905, Ellis applied to Marx & Plummer for an extension of the premium then nearly due. Instead of replying, they evidently referred the same to Cashier Bourke, who on March 15, 1905, replied thereto. That was the inception of much correspondence between Bourke, acting or assuming to act for the company, and Ellis. Some of the letters by Bourke are entirely in keeping with appellant's insistence as to his powers and duties; but others are not. He, for instance, makes propositions to Ellis to change the payment of premiums from annually to semiannually or quarterly at a different rate. He also quotes Ellis term rates and rates for irregular premiums. Again, on August 21, 1905, as one extension was about to expire, Bourke, in asking for a check to cover a second extension which is being considered, says: "I would suggest that you give this matter your prompt attention as the extension expires on the 22nd of this month, which I have extended giving time to receive your remittance and the enclosed request duly signed"; and on August 24th, after the expiration of the previous extension, in connection with proposal to request the home office for another, Bourke urges Ellis to send in the check, saying that he would be protected pending the negotiations "through my having this remittance." The time for payment of balance of the 1905 premium was finally extended to December 22d, and on November 15th Gerald F. Brophy, superintendent, advised Ellis that the society would accept same if paid on or before December 22, 1905. On that day Ellis mailed from Sartartia to Bourke at San Antonio exchange therefor, and this could not reach San Antonio before December 23d, one day too late. But Bourke receives same and receipts therefor on December 27th. A part of his duties was to keep the company's books and deposit collections in bank to its credit. It is fair to assume that he did so here, and the entry of this large payment could not have appeared thereon earlier than the 23d. On December 14th Bourke has asked Ellis to send promptly check for the balance of $1,005.25, less $61.25 to be deducted according to "our personal agreement"; this deduction being allowed on account of time Ellis was thought not to have been insured. The entry in the books of account must have shown this rebate, if correctly kept, as we should assume they were. There is no effort to show want of knowledge by the company of these powers assumed and in fact exercised by Bourke, notwithstanding the pleading advised it that appellee would expect to show such conduct upon his part, and this is true as to the same course of dealing by Wyman in 1906. There appears no efforts to either deny or restrain the exercise by them of these powers, until after Ellis' death,

and then only by showing the stipulation inserted in the policy contract entered into in 1904, and by provisions on back of notices sent out.

[5] It has been many times said that a corporation can only act through its agents, and that general limitations promulgated as to the power of any given agent will yield to the power actually conferred upon him or actually exercised by him with the knowledge and acquiescence of the company. Bona fide restrictions by the company upon powers of subordinate agents should be enforced; but the company should not be permitted to allow the continued disregard thereof until called to account for the acts of the agent and then urge defensively those restrictions. So here, even if the cashiers exceeded their authority, there would be much reason in holding that the society knew and by ratification approved thereof.

Numerous authorities are cited bearing upon the powers of agents as to waiving different provisions of life policies. For instance the Harris Case, 94 Tex. 25, 57 S. W. 635, 86 Am. St. Rep. 813, and the Fitzmaurice Case, 84 Tex. 61, 19 S. W. 301, cited by appellant, hold that a mere soliciting agent who takes and forwards the application for insurance cannot waive misstatements as to the applicant's physical condition. In the Fitzmaurice Case it is said that the provision denying the power to any agent "would at least confine the authority to thus act to a general agent or to one acting within the scope of his employment."

In the Lewis Case, 187 U. S. 335, 23 Sup. Ct. 126, 47 L. Ed. 204, relied upon by counsel for the company, the application had been taken by Starn as a soliciting agent and sent to the company with Lewis' note for part of the premium, and there was provision that failure to pay the note when due should terminate the contract. Before the note matured, it was sent to Starn for collection, and he, in turn, deposited the note in bank for that purpose. The evidence showed an effort by Starn to collect same after maturity, and this was relied upon as showing a waiver. The court alludes to its previous holdings that a waiver of forfeiture may be inferred from the conduct of the company, and that "courts seize hold of any circumstances that indicate an election or intent to waive a forfeiture"; but says such circumstances must have come from the company or from some agent acting within his authority. As the company had done nothing itself, as distinct from the act of Starns, the court properly makes the case turn on his authority. It is then said that it would be difficult to hold that the mere authority to collect the note gave authority to extend time for its payment or to waive an already accrued forfeiture; but, without expressly so deciding, attention is called to the provision of the policy which denied the power to Starn and

also to the contract with Starn, expressly to the same effect, "except in accordance with special instructions from the company in each individual case," and the court had found in effect that there were no such instructions. In concluding it is noted "there is no evidence of any course of dealing of the company or of Starn which enlarged or modified these instructions." There the company showed the provisions of its contract with its agent, and that there were no special instructions. Not so here. And here we have the course of dealing of the cashier in 1905, never objected to or dissented from by the company, so far as the evidence indicates.

Without discussing each case in detail, we cite the following authorities as fairly supporting our conclusion, although not exactly analogous in their facts: Northwestern Association v. Findley, 29 Tex. Civ. App. 494, 68 S. W. 696; U. S. v. Lesser, 126 Ala. 568, 28 South. 646; James v. Insurance Co., 148 Mo. 10, 49 S. W. 978; Insurance Co. v. Lee, 73 Tex. 641, 11 S. W. 1024; Stewart v. Insurance Co., 155 N. Y. 258, 49 N. E. 876, 42 L. R. A. 147; Mayer v. Ins. Co., 38 Iowa, 310, 18 Am. Rep. 34; Insurance Co. v. Koehler, 168 Ill. 293, 48 N. E. 297, 61 Am. St. Rep. 108; Ins. Co. v. Bowen, 102 S. W. 163.

[6, 7] The acts of Cashier Wyman in 1906 will be considered hereinafter, same being of the same general nature as those of Bourke in 1905, and we conclude the jury were authorized to find each within the scope of their authority. But even if they, as such agents, had no authority to delay collection of premiums, or to receive past-due premiums, or to negotiate loans by the company to pay such premiums, or to waive or hold in abeyance a forfeiture, yet we think their course of dealing not without proper probative effect. The company itself admittedly had all such powers. If when the premium came due in March, 1906, its executive officers or any of them thought it best to suspend the forfeiture while an effort should be made to induce Ellis to pay or arrange for payment, they certainly could do so. Now are not the acts and declarations of Wyman in 1906 and of Bourke in 1905 some evidence of such election by the company itself? If my agents are authorized to pursue a given course only in case I have done a certain thing, would not their open pursuit of that course fairly indicate my having done the antecedent thing? The prima facie presumption should be that the agent acts with rather than without authority, and if the principal, when confronted with his agent's acts, is silent, may not the jury conclude that the conditions precedent to the right of the agent to act as he did, in fact, existed?

[8, 9] It is, however, urged with much earnestness that there is no evidence of or indicating a waiver or purpose to waive the forfeiture which the policy declares shall follow failure to pay promptly. To this con-

tention we cannot assent. It is unquestionably true that the failure to pay the premium when due would, in the absence of any other controlling condition, ipso facto forfeit the policy (Insurance Co. v. Bradley, 98 Tex. 230, 82 S. W. 1031, 68 L. R. A. 509; Insurance Co. v. Manning, 38 Tex. Civ. App. 498, 86 S. W. 620; Insurance Co. v. Reppond, 81 S. W. 1012); but it is just as certainly true that the company could, by its election, avoid that result and keep the policy in force. "It is a familiar rule of law that a party for whose benefit a condition is inserted in a written contract may waive it. In case the provision is that the contract shall cease to have effect or become void for the breach of a condition by one party, the other has the right to elect whether or not he will take advantage of the forfeiture or permit the contract to remain in force." Crescent Co. v. Griffin, 59 Tex. 513; Insurance Co. v. Evans, 136 Ky. 391, 124 S. W. 376; Morrison v. Insurance Co., 69 Tex. 363, 6 S. W. 605, 5 Am. St. Rep. 63; Brady v. Nagle, 29 S. W. 943; Morris v. De Wolf, 33 S. W. 556.

[10] And "the rule is now established that a waiver of the forfeiture of a policy in the absence of any agreement to that effect results from negotiations or transactions with the insured after knowledge of the forfeiture, by which the insurer recognizes the continued validity of the policy, or does acts based thereon." 2 Beach, Ins. § 753. The true view, we think, is expressed in Titus v. Insurance Co., 81 N. Y. 419, a case so often cited with approval. It is there said: "When there has been a breach of a condition contained in an insurance policy, the insurance company may or may not take advantage of such breach and claim a forfeiture. It may consult its own interests, choose to waive the forfeiture, and this it may do by express language to that effect or by acts from which an intention to waive may be inferred, or from which a waiver follows as a legal result. A waiver cannot be inferred from its mere silence. It is not obliged to do or say anything to make the forfeiture effectual. It may wait until claim is made under the policy, and then in denial thereof or in defense of a suit commenced therefor allege forfeiture. But it may be asserted broadly that if in any negotiations or transactions with the insured, after knowledge of the forfeiture, it recognizes the policy, or does acts based thereon, or requires the insured by virtue thereof to do some act or incur some trouble or expense, the forfeiture is as matter of law waived; and it is now settled in this court, after some difference of opinion, that such a waiver need not be based upon any new agreement or estoppel. Forfeitures are not favored in the law, and this doctrine of waiver is not peculiar to insurance policies, but is applicable to all cases of forfeiture. As to leases it is thus laid down in Taylor's Landlord and Tenant (5th Ed.) § 287: 'The

forfeiture of a lease by breach of any condition may, however, be waived in like manner as a forfeiture for nonpayment of rent, or a notice to quit; for if the landlord does any act with knowledge of the breach, which can be considered as an acknowledgment of a tenancy still subsisting, he waives the forfeiture.'" To the same effect, see U. S. Co. v. Lesser, 126 Ala. 568, 28 South. 646; Knarston v. Company, 124 Cal. 77, 56 Pac. 773; Insurance Co. v. Evans, 136 Ky. 391, 124 S. W. 379; Insurance Co. v. Springgate, 129 Ky. 627, 112 S. W. 681, 113 S. W. 824, 19 Ky. Law Rep. 227; Murray v. Insurance Co., 90 Cal. 406, 27 Pac. 309, 25 Am. St. Rep. 133; Washburn v. Company, 143 Ala. 485, 38 South. 1011; Insurance Co. v. Norton, 96 U. S. 235, 24 L. Ed. 689. As said by Chief Justice Fuller in McMaster's Case, 183 U. S. 35, 22 Sup. Ct. 14, 46 L. Ed. 71: "The contracts were not assurances for a single year on payment of stipulated premiums, but were entire contracts for life, subject to forfeiture by failure to perform the condition subsequent of payment as provided." So it is here.

[11] The policy promises to pay Mrs. Ellis $25,000 on death of her son. That promise was binding on the company, unless it had been in some way released therefrom. When Ellis failed to pay the premium, there accrued at once a privilege, but not a duty, to terminate that promise. Good reasons suggest themselves why the company may not have desired to avail of this privilege. The insured was then in good health, just barely 38 years of age, and the annual premium accruing on the two policies was $1,449. He had been then only recently re-examined and found in good physical condition. On April 19, 1906, Mr. Wyman in writing Mr. Brophy at the home office says: "I am writing you for this information at the request of Mr. Baker, who is very anxious to have the policies kept in force, as they are large policies, and Mr. Ellis is a well known man in this section of Texas." It requires no strong flight of imagination to picture appellant's agents urging upon the more moderate insurer the fact that such a well-known man as Ellis was carrying these large policies with it. To many that would have been perhaps an effective argument, and no one knew this better than the company. The attitude of the company towards Ellis is again suggested in Bourke's letter to him of September 22, 1905, where he advises that the company was "willing to make special concessions in this case" and act "contrary to their rules." This results, says Mr. Bourke, "from the facts which I surrendered to them, according to our correspondence." In addition, there had been most persistent effort upon the part of Cashier Bourke to induce Ellis to arrange for payment of premium, thereby preventing lapsing of the policy in 1905. Under these conditions, when default was made by Ellis in 1906, it was rather to be expected that

the company would try to avoid losing the risk. He had already been sent the required notice of the premium to become early due with advice that, unless payment was made on March 24th, the policy would be forfeited and void. No payment being made on that day, the policy was thereafter absolutely void, or else it was an existing live contract. It could not be in force for some purposes and dead for others. It could not maintain a Dr. Jekyl and Mr. Hyde existence. It could not be one thing to-day and another to-morrow. It could not be an existing policy upon which the company was ready to loan money up to the very moment of Ellis' death and then die with him. As stated before, upon default, the company could have permitted the policy to lapse automatically by its own terms. No affirmative act was required upon its part. But did it permit it to lapse? Does not the evidence indicate that it affirmatively held in abeyance the forfeiture, while Ellis was being urged and negotiated with to pay the premium? The jury have said yes, and we are not disposed to override their conclusion. There being no reinstatement involved, if the company after March 24th continued to recognize the policy as existing, it could only mean that it had never ceased to exist, and that, in turn, could only mean that the company had not permitted the lapse.

There is no direct evidence as to any consideration of the matter, one way or the other, by the officers specifically empowered thereto by the policy. What, if any, correspondence they had with Wyman is not shown, nor could it reasonably be shown, by appellee. But, having concluded that the acts of Wyman and Brophy are the company's acts, we may with propriety refer thereto. It thus appears that on March 30, 1906, Ellis applied to General Manager Baker for a loan on these policies. As indicating the cashier's province, Baker refers the letter to Wyman, who writes Ellis on April 3d. From then continuously to Ellis' death, there is correspondence and negotiation between the two looking to payment of the premium, and the making of a loan for that purpose. It is not practicable to set this out, but a significant fact to be observed is that in no letter, as far as we find, is there any reference to the policy as lapsed, or any suggestion that same would need to be reinstated before a loan could be made thereon. The loan was not to be made, of course, upon a forfeited policy. One of two things necessarily was and is true: Either the policy had never been allowed to forfeit, or else a reinstatement was contemplated. The former conclusion was quite as permissible as the latter. But, if mistaken here, it certainly is true that ordinary minds might differ as to the proper conclusion; wherefore the jury's verdict concludes us.

On April 25th, after the policy had lapsed, if it ever did, Mr. Brophy at New York writes Mr. Wyman at Austin as to a proposition of loaning on the policies. Brophy says that, while they are anxious to assist in retaining Ellis' business on their books, yet they cannot make the loan as proposed. In part he writes "that the company could not consider the matter of a loan unless premiums are paid for another full year"; but he says, in substance, the company will loan $575 on each policy by Ellis paying the difference required to complete the third payment. To arrange it that way, he says Ellis must send the difference, along with the policies and necessary loan agreements. There are three things, and only three, prescribed for Ellis as a condition to the loan, that is, send his partial payment, send the policy, and send the loan agreement. No mention of needing any medical examination or reinstatement of the policy; and yet, if there is any virtue in appellant's position, that loan could not have been made without reinstating the policy, which must be preceded by the examination. Brophy's letter clearly recognizes the policy as a then existing one. Again, in the very last letter written by Wyman on May 9th, he says to Ellis: "The society is willing to lend you $1,150 on the policies to apply towards the payment of premiums due a short time ago." Here, again, is a distinct recognition of the then existence of the policy. Upon a lapsed policy, there could be no loan, and, if the policy had been forfeited, there were no premiums to pay. If the company had concluded that its best interest would be promoted by holding in suspense the forfeiture while it undertook to arrange with or induce Ellis to pay, then all the acts and correspondence of Wyman and Brophy are intelligible and consistent with each other and with their duty to the company. Looking backward from their conduct, such a conclusion upon part of the company itself is strongly suggested, and it would be bound of its own election as well because responsible for the acts of these agents.

[12] It is urged, however, that the evidence fails to show that Ellis would have in fact paid had he lived, and stress is laid upon the last letter written by him on May 2d, wherein he states that the contents of Wyman's letter of May 1st was about what he expected. That letter advised of the failure to induce the home office to agree to a loan upon basis desired by Ellis. It asserts, in effect, that he was not surprised at their action as to that. It does not show that he did not intend to pay the premium. In fact, it proves nothing upon that issue. But, whatever may have been Ellis' intention, it is clear that Wyman did not consider it final, and was not yet ready to abandon the effort to induce Ellis to pay the premium which could only be payable upon assumption that the policies were yet in

force. On May 9th Wyman writes Ellis the letter quoted from above. That should have reached Ellis on the 10th. He was then very much pressed with his work, and his failure to reply before the 11th, when he was shot, does not show any cessation of negotiations. As we see it, however, this is not material. Upon the issue of estoppel or a new contract, it might be; but not so as to waiver. Washburn v. Company, 143 Ala. 485, 38 South. 1011. If the policy had been forfeited, no recovery could be had thereon. If not, then the original promise to pay upon Ellis' death was in force and effect, and this without regard to what the outcome would have been of the negotiations about the loan. When Mrs. Ellis showed the issuance of the policy and his death, she became entitled to recover. The company answers that, by reason of the failure to pay, it had the right to and did forfeit the contract. The jury finds, in effect, that, while it had the right, it did not exercise the same, but, on the contrary, elected not to, and in deference to their verdict we so find. The briefs of counsel in this case indicate great industry. We have patiently examined the many cases cited. It has not been practicable to discuss any considerable number thereof, but, having considered them carefully, our conclusion upon the merits of the propositions urged for reversal are indicated hereinbefore. Those conclusions have not been reached without due appreciation of the merit and force of the positions so earnestly pressed by able counsel for appellant; but the very best judgment of which we are capable leads us to adopt the views urged with equal skill by counsel no less able who have appeared for appellee.

In the foregoing discussion, we have covered, not only the principal assignments relied upon, but incidentally others. Each error assigned has been considered, but we find no reversible error shown, and the judgment will be affirmed.

RECTOR, Special Associate Justice. Not being able to concur with the majority in affirming this case, I have concluded to state my views without extended argument. As the disposition of the case is made largely to depend upon the evidence, and not knowing at this time whether or not the majority opinion will contain an extended statement, I have concluded to set out the testimony in its entirety, omitting, however, the correspondence between the assured C. G. Ellis and the general agents of appellant at San Antonio and its cashier in their office during the year 1905, all of which relates to the payment of the annual premium which fell due March 24, 1905. A general statement with respect to that correspondence, it is thought, will be sufficient. That correspondence shows that on receipt of notice of the maturity of said premium, and prior to March 24, 1905, the insured applied for an extension of time within which to pay same, and term insurance was paid, which extended the time for payment to August 22, 1905; that, when the extension expired, Ellis had not paid the premium, and thereafter several letters were written by Bourke, the then cashier, in the office of the general agents at San Antonio. These letters were for the most part answered by Ellis, and the time through which the correspondence ran lasted from August 18 to December 27, 1905. The correspondence indicates that the policy was lapsed some time in September, 1905, the exact date not appearing, and was reinstated upon medical examination and health certificate, some time in October, the exact date not given, and that the premium was at last paid on or about December 22, 1905. In the final settlement it seems that Ellis was allowed $61 rebate for about a month's time during which his policy was lapsed. Ellis applied for further extension to December 22, 1905, which the company granted, and on November 7, 1905, he paid $245 for term insurance which reinstated his two policies issued to him, the one in suit payable to his mother, and another for like amount issued at the same time and payable to Olive Ellis, his wife. The application for reinstatement of said Ellis was made in writing October 21, 1905, to which was attached the certificate of medical examination made by Dr. W. Neal Watt of Austin, Tex. The policy issued, on which this suit was brought, recites that the Equitable Life Assurance Society of the United States hereby assures the life of Caswell G. Ellis of Sartartia, Tex., hereinafter called the assured, and on receipt of satisfactory proofs of the death of said assured, provided this policy is then in force, agrees to pay $25,000, at its office in the city of New York to his mother, Amanda M. Ellis, if living, subject to the privileges and conditions stated on the second and third pages hereof which form a part of this contract, as fully as if recited at length over the signatures hereto affixed. The policy contained the following provision: "This assurance is granted in consideration of the written and printed application for this policy, which is hereby made a part of this contract and of the payment in advance of seven hundred and twenty four $50/100$ dollars, and of the payment of a like sum on or before the 24th day of March in every year thereafter, during the continuance of this contract." The policy also contained the following provision: "IV.—Grace in the payment of premiums. Should default be made at any time hereafter in the payment of any premium due upon this policy as herein provided, the society will waive such default and accept the payment of such premium, provided the amount thereof, with interest thereon at five per cent. per annum from the date of default, be tendered to it

within thirty days after such default." Re-instatement: "Should this policy lapse by reason of the nonpayment of any premium, it may be reinstated at any time upon the assured furnishing evidence of good health satisfactory to the society, and the payment of all arrears and any indebtedness to the society under this contract existing at the date of lapse, with interest thereon at five per cent. per annum." In paragraph 7 of said policy it is also provided as follows: "This policy shall lapse and together with all premiums paid thereon shall forfeit to the society on the non payment of any premium when due." Paragraph 14 of said policy is as follows: "XIV. Policy and application the entire contract. This policy and the application therefor, taken together, constitute the entire contract which cannot be varied except in writing by one of the following executive officers of the society at its home office in New York, viz.: The president, one of the vice presidents, the secretary, the assistant secretary, the comptroller, the actuary, the assistant actuary, the treasurer, the auditor, the associate auditor, the recorder, the registrar and the assistant registrar." On February 13, 1906, the appellee mailed a notice, addressed to the assured at Sartartia, Tex., notifying him of the maturity of the premium on March 24, 1906, which was received by him on February 16, 1906, and which, with the indorsements thereon, is as follows:

"The Equitable Life Assurance Society of the United States.

"Take notice that a premium of $724.50 will become due on policy No. 1324813 if all previous premiums have been paid and said policy is otherwise in force on March 24th, 1906, and be payable to said society at its office No. 120 Broadway, in the borough of Manhattan, city of New York.

"Unless the premium then due shall be paid to said society or the duly appointed agent or person authorized to collect such premium by or before the day it falls due, the policy and all payments thereon will be forfeited and void, except as to the right to a surrender value or paid up policy, as provided in the insurance law, chapter 690 of the laws of 1892 of New York, and except as otherwise provided in the policy.

"Said premium may be paid on or before the date when due by express bank money order, draft, check or post office to Jas. H. Wyman, Cashier, Austin, Texas, or to such person as he may duly appoint on the production of the proper receipt therefor, signed by the secretary of the society. If any claim for or right of forfeiture or any default on the part of the holder of the said policy now exists, the society does not by this notice waive the same.

"M. Murray, Cashier.

"Note.—The policy referred to in the above notice contains the following provision: 'Should default be made at any time hereafter in the payment of any premium due upon this policy as herein provided, the society will waive such default and accept the payment of said premium, provided the amount thereof with interest thereon at five per cent. per annum from date of default be tendered to it within thirty days after such default.' (Over.)

"No payment of premium made to any person except in exchange for the official receipt signed by the Secretary of the Society, can be recognized. Enclose this card with your remittance in payment of premium specified on the other side.

"Please notify the Equitable Life Assurance Society, 120 Broadway, New York City, of any error or change in your post office address in writing at same time giving numbers of all policies on your life in the society.

"Agents are not authorized and cannot grant an extension of the time for payment of premium. If the society has heretofore granted such extensions it in no way binds it to make other or further extensions, and it is not to be construed as its practice or custom."

Thereupon the following correspondence took place:

"Sartartia, Texas, Feb. 16, 1906. Mr. Jas. H. Wyman, Cashier, Austin, Texas—Dear Sir: I have your notice stating that my premium would come due on the 24th of March on the two policies which I hold. Yours truly, C. G. Ellis."

"Austin. April 3, 1906. Mr. C. G. Ellis, Sartartia, Texas—Dear Sir: Replying to your letter of the 30th ult. to Mr. Baker in which you applied for a loan on your policies (Nos. 1,324,813–814, the loan value of each policy is $575. You will see that it will therefore be necessary for you to send me a remittance of $356.50 in order to complete the transaction. I enclose loan agreement which should be executed as indicated before a notary public and returned me with the policies. Do not fill in the dates of the agreements, this will be done the day the loan is completed. You should also sign and return the slip attached, asking us to deduct the premiums from the loan. On referring to the applications you gave for these policies, I find that one of the policies is payable to your wife and the other to your mother. Not keeping a complete record of these policies, I do not know which is which. I will therefore ask that you fill out the agreements in accordance with the reading of the policies. Your wife should join with you in executing the agreement on the policy payable to her, and your mother with you in executing the agreement on the policy payable to her. When these papers are completed, send them all to me with the remittance, and I shall be pleased to refer them to the home office for their approval. 1 would suggest that you call my attention to the matter

next fall when you are in a position to make a payment on your policy, and at that time we can arrange it so that you can pay an irregular premium, carrying your policy in force from March, 1907, until some time in the fall of the year, at date most convenient for you and the annual premium to fall due on that date each year thereafter. Awaiting your further advice, I am very truly yours, Jas. H. Wyman, Cashier."

Inclosed with this letter were two loan agreements, each in the following words and figures, except that one related to policy No. 1324813, and the other to policy No. 1324814, to wit:

$575.00.

"This agreement made this —— day of —— between the Equitable Life Assurance Society of the United States party of the first part and —— parties of the second part, witnesseth: The party of the first part agrees to loan and does hereby loan to the parties of the second part the sum of five hundred and seventy five dollars, receipt of which is hereby acknowledged by the parties of the second part; and the said parties of the second part agree to repay the same to the said party of the first part at its office, 120 Broadway, New York City, on the —— day of ——, 19——.

"In consideration of said loan the parties of the second part hereby assign, set over and transfer all their right, title and interest in policy No. 1324813 on the life of C. G. Ellis, issued by said party of the first part, together with all money which may be payable under the same to said party of the first part as collateral security for the payment of said loan.

"In the event of default in the payment of said loan upon the date hereinabove mentioned, the party of the first part is hereby fully authorized and empowered, without notice to and without demand for payment by the parties of the second part, to cancel said policy and apply the cash surrender value of such cancellation to the payment of said loan and any unpaid interest. Should the surrender value of said policy exceed the amount of above loan with interest at five per cent. thereon, then and in that case the excess value above the loan and interest shall be made due and payable to the legal owner or owners of the policy on demand.

"In witness whereof we have hereunto set our hands and seal. In the presence of

          "—————————
"Name of assured
          "—————————
          "Address.
          "—————————
"Name of Beneficiary.
          "—————————
          "Address.

"[Notary's Seal.]

"N. B. If witnessed by the society's manager or cashier the signature of a notary will not be required."

Attached to each of said instruments was a slip reading as follows: "Equitable Life Assurance Society, Austin. Equitable Life Assurance Society. Please deduct $724.50 premium due 3-24-06, from loan made on my policy No. 1324813. Loan papers enclosed herewith"—one of said slips being intended for policy No. 1324813 and the other for policy No. 1324814, but in other respects identical.

"Sartartia, Texas. Apr. 5, '06. Mr. James H. Wyman, San Antonio, Texas—Dear Sir: I have your letter of the third relative to my insurance policies. I think probably there is some mistake in this. I want the date of payments to be set up just nine months, that is, from the 24th of March to the 24th of December, and I want to make the payments in such a way that it will bring about these conditions. Now the premiums on my two policies amount to $1449, or $120.75 a month, which would be $1086.75. You said that the loan on the policies would be $575 each or $1150 on the two, which would be in excess of the amount of the premium for nine months and make the premiums become due on the 24th of December. Also the two notes which you wish us to execute amount to $1150, you also ask for a cash payment of $356.50, this amount added to the two notes would be $1506.50, which would be in excess of the year's premiums $57. We suppose that there is a mistake somewhere in this discrepancy. I would be glad if you would look this over and would arrange it so as to bring about the desired results, or explain to me where this difference comes in, and in what way they are going to work. Yours truly, C. G. Ellis."

"Sartartia, Texas. April 11, 1906. Mr. James H. Wyman, Austin, Texas—Dear Sir: Referring to the correspondence of several days ago about the payment of the premiums on my two policies, will say that I have had no reply and would be pleased to hear from you at your earliest convenience. Yours truly, C. G. Ellis."

"Austin, Texas, April 12, 1906. Mr. C. G. Ellis, Sartartia, Texas—Dear Sir: I am in receipt of your letter of the 11th inst. and enclose herewith an exact copy of my letter to you of the third. I do not understand why this letter did not reach you. If I can be of any further service to you, kindly advise. Very truly yours, James H. Wyman, Cashier."

"Sartartia, Texas. Apr. 15, 1906. Mr. James H. Wyman, Cashier, Austin, Texas— Dear Sir: Replying to yours of the 12th will say that we received the original letter of April 3rd and replied to it, which evidently you did not receive. I herewith enclose you copy of reply to yours of the 3rd. Yours very truly, C. G. Ellis."

"Austin, Texas. April 16, 1906. Mr. C. G. Ellis, Sartartia, Texas—Dear Sir: Yours of the 15th inst. enclosing copy of your letter of the 5th inst. which we did not receive.

It is necessary to complete the transaction as advised in my previous letter, as loan on policies cannot be made unless premiums are paid for three full years. If you only paid the premiums for this fall it would not complete the year. It is therefore necessary to execute the loan agreement for $575 on each policy, remitting me the balance, to complete the transaction. The difference in your letter of $57.50 is one year's interest in advance on loan. This fall, if you wish to make an irregular payment, then you can do so, carrying your policy in force from March, 1907, until such date in the fall as you may wish, and thereafter the premiums will fall due in the fall of the year. Should you continue to pay the premiums for the full twenty years instead of paying the full annual premium for the twentieth year you will pay only a balance necessary to carry your policy from the date in the fall until its maturity in March. I hope I have made myself clear, if not kindly advise me further. Yours very truly, James H. Wyman, Cashier."

"Sartartia, Texas. April 18, 1906. Mr. James H. Wyman, Austin, Texas—Dear Sir: I have your letter of the 16th and will say that I cannot understand why it is that the policies have a loan value of $150 more than I want, why it is necessary for me to pay near $400 more than what I want and which I am not prepared to do. I trust that the matter can be arranged in this way and which I am ready to carry out any day. The way you propose arranging it will still make the premium due on the 24th of March, the very thing that I am trying to get away from, and would require me to execute my note and a lien on the policies for more money than contemplated, and would be required to carry the policies from the 24th day of March to the 24th day of December, besides paying interest on the full amount, it strikes me that it would be a rather one-sided trade. I am willing to give my note, secured by a lien on the policies for the amount of the premiums on the policies from the 24th of March to the 24th of December, together with five per cent. interest on the same. The loan value, according to your letter exceeds the amount of these premiums about $150. Kindly let me hear from you at your earliest convenience. Yours truly, C. G. Ellis."

"Austin. April 19, 1906. Mr. C. G. Ellis, Sartartia, Texas—Dear Sir: Referring to your letter to me of recent date, I am taking the matter up with the home office in regard to loan to pay premiums on your policies, and will advise you just as soon as I hear from them. In the mean time, in order that you may be fully protected under these policies, I enclose a request for extension of thirty days, which kindly sign and return to me with a remittance of $61 to cover term rate for that time. This amount will be held in this office in suspense until the matter is adjusted. I ask this, because your thirty days of grace expires on next Tuesday. Yours very truly, James H. Wyman, Cashier."

"Austin. May 1st, 1906. Mr. C. G. Ellis, Sartartia, Texas—Dear Sir: I have not heard from you in reference to your policies Nos. 1,324,813–14 which were due March 24th, the 30 days grace carrying them to April 24th. As I advised you, I wrote the home office in reference to a loan, they could not at this time grant a loan unless the premiums were paid carrying the policy in force to March 24th, 1907. I hope I will receive a remittance from you covering the amount necessary to complete the transaction, and, in as much as the premiums are now past due, it will be necessary for you to add five per cent. interest to the premiums from March 24th, the due date of the same. Kindly let me hear from you by return mail. Yours very truly, James H. Wyman, Cashier."

"Sartartia, Tex. May 2nd, '06. Mr. James H. Wyman, Austin, Texas—Dear Sir: I fully note the contents of yours of the first, which is about what I expected. Yours very truly. C. G. Ellis."

"Austin. May 9th, 1906. Mr. C. G. Ellis, Sartartia, Texas—Dear Sir: Your letter of the 5th inst. has been forwarded to me from San Antonio, as you will see by the enclosed envelope. I am sorry that I did not make the matter plain to you in reference to the loan on your policies. You will see by referring to the policies themselves that three full years premium must be paid before a loan can be obtained. That is the reason why we are compelled to ask you for a remittance to complete the loan transaction. We cannot grant you a loan on the policies to pay the premiums for nine months, it is necessary to pay the premiums carrying policies in force from March, 1906, to March, 1907, in order to secure the loan. In other words, we cannot make you a loan on the policies unless the premiums for three years are paid. The society is willing to lend you $1159 on the policies to apply towards the payment of premiums due a short time ago. Yours very truly, James H. Wyman, Cashier."

The appointment of J. H. Wyman as cashier is provided by section 20 of the general agents contract and his powers and duties are therein defined. Said section is as follows: "(20) The said society reserves the right to appoint a cashier for the purpose of keeping the accounts and making collections. In case of the appointment of such cashier, all collections shall be made by him, and the bank account for the deposits of all funds shall be kept in the name of the Equitable Life Assurance Society of the United States. It shall be the duty of such cashier to keep exclusive control of all policies, renewal receipts, and other vouchers subject to the rules of said society and the instructions given by its principal officers. In case a cashier is appointed, said party of the second

part may collect only first premiums on policies obtained through his instrumentality. New policies may be delivered to said party of the second part by the cashier for such collection, or may be sent for collection on the specific order of the said party of the second part to such person or persons as he may designate, but are to be returned to the cashier from time to time when not collected, as may be desired by the cashier or said society. All premiums as soon as settled, shall be immediately paid over to the cashier." R. H. Baker testified that he was general manager for appellant for a large portion of the state of Texas when the policy in suit was issued; that J. H. Wyman was the appellant's cashier in his office in 1906; that said Wyman was not in Texas; that he had left the state; that witness had supervision over the general agents, but had no authority to employ or discharge agents. Testifying as to the duties of cashier Wyman in his office, he said the renewal receipt was sent to the cashier by the home office, and, when the policy holder paid the premium, it was countersigned by the cashier and delivered to the assured. He further testified that he had no authority, either as general agent or general manager, to grant extensions on renewal premiums on policies that had been issued. Mr. Wyman had no such authority, and the home office only could grant the extension. In 1906 witness stated that Gerald F. Brophy held the position of superintendent of the extension and loan department. In case a policy holder wishes a loan on his policy, a blank form would be sent to the applicant to be filled out and sent to the cashier and by him to Mr. Brophy or the loan department in New York. If the loan is granted, the cashier is notified, and a check for amount of loan is sent to the cashier. The policies are assigned and delivered when the check is delivered. "I don't know the details of it, as I never managed a loan personally. The cashier handles that."

The following correspondence between J. H. Wyman and G. F. Brophy was introduced by appellee:

"Austin, Texas. April 19, 1906. Mr. G. F. Brophy, Superintendent—Dear Sir: I have had some correspondence with Mr. C. G. Ellis in connection with the annual premiums due March 24th on his policies Nos. 1324813-14. He wishes to have an irregular payment made, carrying these policies in force for nine months, but he is not in the position to make the payment. I suggested that he apply for a loan for enough to carry the policies in force for one year, remitting the balance necessary to complete the transaction. He now states that he is not in the position to do this, and wants to know if he cannot make a loan for an amount large enough to carry the policies in force to December 24th of this year, when he will be in the position to meet the full annual premium. He is very anxious to continue these policies,

and this appears to be the only way that he can continue with us. I am writing you for this information at the request of Mr. Baker, who is very anxious to have the policies kept in force, as they are large policies and Mr. Ellis is a well known man in this section of Texas. Yours very truly, James H. Wyman, Cashier."

"New York, April 25th, 1906. Mr. James H. Wyman, Austin, Texas—Dear Sir: Your letter of the 19th inst. in regard to policies Nos. 1324813 and 1324814—Ellis—is received and carefully noted. We find that these policies were issued in March, 1904, so that only two full years premiums have been paid on each. We could not, therefore, consider the matter of a loan unless premiums are paid for another full year on each policy, thereby completing the three years payments which must be made before the contracts become entitled to any surrender value. Much as we would like to assist you in retaining this business on the books, we are unable to extend the desired aid in this instance for reasons above explained. Provided that premiums are paid to March 24th, 1907, a loan for $575 could be granted on the security of each contract; in fact, it would not be necessary for Mr. Ellis to actually pay these premiums in order to obtain the loans. It is possible for us, as you are aware, to complete the loans, applying the proceeds in payment of the premiums, but we cannot undertake these transactions unless the balance required to close the deal is forwarded to us, together with the policies and necessary loan agreements. Regretting our inability to serve you, we remain, very truly yours, G. F. Brophy, Superintendent."

John C. Sullivan testified that as attorney for appellee on May 22, 1906, he tendered to J. H. Wyman $775 for premium due March 24, 1906; that he kept up said tender, and was willing to pay it at any time which tender he declined to accept.

Mrs. Olive Ellis, widow of said C. G. Ellis, testified that her husband was in excellent health from May 1, 1906, up to the time he received a gun shot wound about 6 o'clock p. m. May 11, 1906, and he died from the effects of said wound about daylight of the next day. She further testified that during said time he was a very busy man; that they worked on the plantation between 150 and 175 men; that he was going from daylight until dark, only taking time to eat his dinner.

The appellant read in evidence the receipt given C. G. Ellis for the first premium due on the two policies for $1,449, reciting that same was given for first premium on $50,000 life policies for self on his application for said insurance in said amount, the assurance to be from date of receipt March 24, 1904, provided application was accepted, etc. It will be seen that by the very terms of the policy itself it lapsed and ceased to insure when the assured failed to pay the premium

maturing on the 24th day of March, 1906. It is true that the assured had the contract right, within 30 days thereafter, to pay said premium with interest, and the company would, under such circumstances, be compelled to waive the lapse, and the policy would be restored by virtue of its own terms. It required no act to be done on the part of the company to lapse the policy. Nonpayment of the premium lapsed it. Insurance Co. v. Reppond, 81 S. W. 1012; Laughlin v. Insurance Co., 8 Tex. Civ. App. 448, 28 S. W. 411; Cowen v. Equitable Life Assurance Society, 37 Tex. Civ. App. 430, 84 S. W. 404; Thompson v. Insurance Co., 104 U. S. 257, 26 L. Ed. 765. This proposition might be supported by the citation of many decisions by the courts of final resort in perhaps all the states of the Union. It is not controverted in the majority opinion. It is insisted, however, that the forfeiture clause in the policy, inserted for the benefit of the insurance company, had been waived by it, and that the policy sued on was in full force on May 12, 1906, the date of the death of the assured.

If the testimony sustained the waiver, or if there is enough in the evidence to warrant a difference of opinion among reasonable men, then the verdict of the jury ought not to be disturbed by this court. Counsel for appellee contend, both by brief and oral argument, that the testimony establishes, or at least tends to establish, three grounds, upon either of which this court ought to affirm the judgment of the district court: First, estoppel; second, waiver; and, third, a new contract. It seems to me too plain for argument that the record contains no element of estoppel against appellant. Nothing that it ever did or stated to the assured prior to March 1, 1906, was shown which remotely indicated to him that the company would not require prompt payment of this premium when due. On the contrary, the written notice of its maturity received by him more than a month before it became due informed him that it must be paid on that day or his insurance policy would lapse. No new contract of insurance was made with the assured. If it can be said that the insurance company offered to receive the premium after its maturity, it is certainly true that the insured, if he ever promised to pay the same, never in fact paid the premium. How then can it be contended that he and the company ever made a new contract of insurance? As before stated, the policy lapsed on March 24, 1906, on nonpayment of the premium, unless the company by its authorized agents elected to waive the forfeiture before or at that very date. Nothing occurring before that time even remotely indicates such conclusion. The decision of the question is then narrowed down to the correspondence between that date and the 9th day of May, when J. H. Wyman,

cashier, last wrote the assured in relation to the loan on the policies to enable him to make the payment of the then past due premiums on this policy, and another of equal amount in favor of his wife. The policy was no more a lapsed policy after April 24th than it was between that date and March 24th. The only difference was that up to April 24th the company was under contract to waive the forfeiture and restore the policy on payment of the premium, with interest from the day of its maturity. The company had to do nothing affirmatively to forfeit nor to restore it between those dates. At any time after the 30 days of grace, the assured could be reinstated by making application therefor accompanying the application with a medical certificate of good health, and the amount of past due premiums, with interest from the date it was due. There was no express waiver shown, nor do I believe that the testimony warranted the jury in finding that there was an implied waiver. On April 19, 1906, Wyman, the cashier, between whom and the assured several letters had passed relating to securing a loan on his policies, wrote to G. F. Brophy, superintendent of the loan department in New York, inquiring if the company could vary the terms of the policy and make assured a loan, notwithstanding the policy stated that the same had no loan value until three annual payments had been made. Only two annual premiums had been paid. Ellis had written Wyman that he did not have the money to pay the premium. On April 25th, one day after the 30 days of grace had expired, he replied to said letter, stating that the company could not make the loan unless three annual premiums were first paid, but explaining that the amount of the loan could be deducted from the annual premiums that were due on the two policies issued to the assured. On May 1, 1906, Wyman wrote Ellis, acquainting him with the contents of Brophy's letter, and expressed the hope that he would receive remittance covering the amount necessary to complete the transaction; and further calling his attention to the fact that 5 per cent. interest on the premium due March 24th must be remitted. On May 2d Ellis replied acknowledging receipt, and stating that "is about what I expected." This is the last word received from him. On May 9th, Wyman, on receipt of Ellis' letter of April 5th, which had been misdirected and addressed to him at San Antonio, again wrote to Ellis regarding said loan substantially in the same language as his former letter. He closes this letter by stating: "The society is willing to lend you $1,159 on the policies, to apply towards the payment of premiums due a short time ago." The majority of the court concluded that the language used in the Brophy letter and in the two letters written by Wyman after April 24th, read in

the light of all the correspondence in 1906, hereinbefore set out, shows, or tends to show, that the company had elected to waive the forfeiture by reason of the nonpayment of the premium on March 24, 1906. In this conclusion I cannot concur. At the most, the testimony tends to show that if the assured, on receipt of the last letter of Wyman, which he doubtless received on May 10th, had remitted the amount of said premium, with 5 per cent. interest since the default, and was in good health, the company would have waived the default and restored the policy, and this, too, without a medical examination and certificate of health. But this concession comes far short of conceding any waiver of forfeiture, either express or implied. Mere indulgence on the part of the company does not show or tend to show waiver. Cohen v. Insurance Co., 67 Tex. 327, 3 S. W. 296, 60 Am. Rep. 7; Sovereign Camp Woodmen of the World v. Hicks, 37 Tex. Civ. App. 424, 84 S. W. 425; Cowen v. Equitable Life Assurance Society, 37 Tex. Civ. App. 430, 84 S. W. 404; Thompson v. Insurance Co., 104 U. S. 257, 26 L. Ed. 765; Lantz v. Vermont Ins. Co., 139 Pa. 546, 21 Atl. 81, 10 L. R. A. 577, 23 Am. St. Rep. 202; Iowa L. Ins. Co. v. Lewis, 187 U. S. 335, 23 Sup. Ct. 126, 47 L. Ed. 204. But Ellis never paid the premium, nor, in fact, promised to do so. After stating that he was not prepared to pay, he opened up with Wyman, cashier, at Austin, a correspondence, in which he expressed a desire to pay the premium, provided he could borrow the money on his policies, on which he had paid only two annual premiums, but which had no loan value at all, until he had paid three annual premiums. In the correspondence which followed, we discover that Wyman was only endeavoring in every way he could to assist Ellis to keep his policy alive. The policy having lapsed by its own terms on the failure of the assured to pay the premium on March 24th, neither Brophy nor Wyman (neither of whom had authority to waive forfeitures and restore policies) could by implication restore a lapsed policy by the mere failure to refer to it as a lapsed policy in their letters to assured relating to a loan. Ellis was under no legal obligation to pay the premium after the policy lapsed. The company could not have enforced its collection by suit. Lantz v. Vermont Ins. Co., 139 Pa. 546, 21 Atl. 81, 10 L. R. A. 577, 23 Am. St. Rep. 202; Fraser v. Home Life Ins. Co., 71 Vt. 482, 45 Atl. 1047.

If, as the majority holds, the jury were authorized to infer from the correspondence that the company waived the forfeiture on March 24th, then we ask how long must the waiver be presumed to exist. If the answer is up to May 10th, when Ellis received Wyman's last letter, must it then continue indefinitely? If so, we have the company carrying a risk on the two policies for $50,000 without cost to the insured. Appellee's counsel in their brief and oral argument say that it must continue for a reasonable time, and that the jury had a right to presume two things: First, that he would be willing to pay; and, second, that he would have the ability to pay. The answer to this is that Ellis' promise to pay (if he made any, which he did not do) was wholly nudum pactum. He would not be entitled to recover until he accepted the indulgence offered, and paid the premium. If he had done this, a new contract would have been created, founded, it is true, upon the lapsed and dead policy. He did not accept the offer by payment of the premium. The beneficiary in the policy cannot after his death, even within the shortest time thereafter, pay a premium for a dead person on a dead policy. Thompson v. Insurance Co., 116 Tenn. 557, 92 S. W. 1099, 6 L. R. A. (N. S.) 1039, 115 Am. St. Rep. 823; Nat. Life Ins. Co. v. Manning, 38 Tex. Civ. App. 498, 86 S. W. 618.

We now come to the discussion of the question as to whether Wyman, the cashier, or Brophy, the superintendent of the loan department, had any authority to grant extensions or waive forfeitures, if, indeed, it can be claimed that this record shows they did, or attempted to do so. As before stated, I do not believe the record shows any such assumption by them or either of them. As will be seen, Brophy's letter was written to Wyman, cashier, in answer to his relating to a loan desired by the assured. That was the only matter about which the correspondence related. Wyman had written to Ellis prior to April 24th, notifying him that the 30 days grace would expire on that date and had inclosed an application for term insurance for 30 days, and requested the remittance of $61 to cover the term insurance. In this letter this procedure was suggested so that Ellis might be fully protected. The assured refused, or at least, failed, to sign and return the application for extension, or to remit the money. Notwithstanding this, however, Wyman wrote to Brophy, and received his reply, stating that the company could not change the policy, and make the loan unless three annual premiums were first paid, however much the company would like to accommodate Mr. Baker in his desire to keep the policies on his books. Ellis was plainly advised by the policy itself, and by the notice that he had received, that none but the executive officers named in the policy had any authority to grant extensions or to waive the forfeitures. While it is true that the company, notwithstanding the limitations in the policy, could either in writing or by parol employ other persons than those named in the policy to do the very things confided to the agents and officers therein named, it is also likewise true that the testimony must show either express or implied authori-

ty conferred by the company on Brophy or Wyman to grant extensions and waive forfeitures. No express authority is shown by the record which would authorize either of them to do these acts. Nor can it be successfully contended that Wyman had such implied authority by reason of the fact that the renewal receipts were sent to him and he had the duty imposed of receiving collections on renewal receipts, and remitting the money to the home office. It has been directly decided by the Supreme Court of the United States that it cannot be inferred from the agent's authority to collect that he had the power to waive forfeitures. Insurance Co. v. Lewis, 187 U. S. 335, 23 Sup. Ct. 126, 47 L. Ed. 204.

There was no effort made to show that the officers authorized to make waivers and extensions ever knew of the correspondence set out in the beginning of this opinion; nor that either Brophy or Wyman had ever exercised or attempted to exercise such powers before, or that the company had ever, on any occasion, granted them or either of them any such powers. The correspondence in the record alone must be relied on to support the assumption of implied authority to waive. My opinion is that no waiver was shown. United Moderns v. Pike, 76 S. W. 774; Laughlin v. Fidelity Mut. L. Ass'n, 8 Tex. Civ. App. 448, 28 S. W. 411; Fitzmaurice v. Mut. L. Ins. Co., 84 Tex. 62, 19 S. W. 301; Ins. Co. v. Lewis, 187 U. S. 335, 23 Sup. Ct. 126, 47 L. Ed., 204, supra.

I have carefully considered all of the authorities upon which the majority base their opinion, but have not space to review them here. In most, if not all, of them, the insurance company was held bound upon the ground that the agent acting was the general agent of the company in its alter ego. In some of them the company was held to be estopped to refuse payment under the particular circumstances of the case.

I think the anniversary of premium on the policy was March 24th, and not on April 16th, the date of the policy, nor on May 6th, the date of its delivery, and therefore conclude that appellee's cross-assignments of error raising this issue are not well taken, and should be overruled.

It follows from what has been stated that my opinion is that the judgment below ought to be reversed, and judgment here rendered for appellant.

KEY, C. J., and RICE, J., disqualified; BARBER, Special Chief Justice, and RECTOR, Special Associate Justice, sitting in their stead.